[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 08, 2003
THOMAS K. KAHN
CLERK**

_____

No. 02-13874

_____

D. C. Docket No. 00-00184-CV-8-T-26TG

JOHN DOE, JANE DOE, individually
and on behalf of their minor children,D.M.,
N.O., and B.O., and on behalf of a class of
similarly situated persons in the State of Florida,

Plaintiffs-Appellants,

versus

KATHLEEN A. KEARNEY, Secretary
of Florida Department of Children
and Family Services, DON DIXON, District
Administrator for District 6 of Florida
Department of Children and Family Services,
in their official capacities, DEBORAH O'BRIEN,
in her personal capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(May 8, 2003)**

Before DUBINA and BLACK, Circuit Judges, and RYSKAMP[*], District Judge.

BLACK, Circuit Judge:

Appellants John Doe and Jane Doe,[1] individually and on behalf of their three minor children, D.M., N.O., and B.O, appeal the district court's dismissal of their action against Appellee Deborah O'Brien.[2] Their claims arise out of an incident in which O'Brien, an authorized agent of the Florida Department of Children and Family Services (DCF), effected an "emergency" removal of Appellants' children without Appellants' permission and without a court order. Appellants brought this action seeking a declaration that Fla. Stat. § 39.401(1), which purportedly authorized the removal of the children, is unconstitutional both facially and as applied to them. They also asserted a 42 U.S.C. § 1983 claim for money damages against O'Brien in her individual capacity, alleging that she violated their constitutional rights by taking their children without judicial authorization and in the absence of a true emergency. For the reasons explained

---

[*]Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District of Florida, sitting by designation.

[1]Appellants are referred to herein pseudonymously.

[2]Appellants filed this action as a class action, but the district court denied class certification and struck all class action allegations. The district court also dismissed claims for damages against state officials in their official capacities on the basis of Eleventh Amendment immunity. These rulings have not been appealed.

herein, we conclude § 39.401(1) is not unconstitutional, and Appellants have not demonstrated a violation of their constitutional rights. Furthermore, in the absence of any constitutional violation, Appellants cannot prevail on their § 1983 claim against O'Brien. Therefore, we affirm.

I.

On January 18, 2000, DCF officials in St. Augustine, Florida, were informed that T.O., John Doe's nine-year-old niece, had recently reported being abused by John Doe approximately four years earlier, when T.O. was five. T.O., who is deaf, reportedly accused John Doe of making her touch his penis and perform oral sex. DCF officials in St. Augustine investigated the report and discovered that John Doe was residing in Hillsborough County, Florida, with his wife, Jane Doe, and their three minor children, D.M. (age 13), N.O. (age 9), and B.O. (age 6).[3] On January 21, 2000, the St. Augustine office forwarded the report to DCF's Hillsborough County office, where the case was assigned to O'Brien at approximately 12:30 P.M.

Soon after receiving the report, O'Brien commenced an investigation and discovered that John Doe had previously been investigated by DCF in 1995. In

---

[3]D.M. is Jane Doe's daughter from a previous marriage. N.O. and B.O. are Appellants' children from their marriage.

the 1995 case, John Doe had been accused of placing his penis in the rectum of a three-year old boy whom Jane Doe was babysitting. According to O'Brien, DCF believed the allegation to be true but had not pressed charges due to lack of cooperation from the victim.[4]

O'Brien also discovered during her investigation that John Doe had a criminal record involving crimes of a sexual nature.[5] According to a report she received from the Florida Department of Law Enforcement (FDLE), John Doe was convicted in 1989 of two counts of lewd and lascivious behavior stemming from an incident in which he exposed and fondled himself in front of children at a school bus stop.[6] The report also indicated that John Doe had previously been charged with solicitation of prostitution and had been accused of, but not charged with, rape.

At approximately 2:10 P.M., O'Brien met with her supervisor, Wanda Rios. Rios recommended sheltering all three of Appellants' children, but advised

---

[4]Appellants contend there is no evidence such a determination was ever made.

[5]John Doe was also previously convicted of four counts of burglary, for which he served approximately nine years in prison.

[6]O'Brien appears to have mistakenly read the FDLE report as reflecting a conviction for "child fondling." In actuality, John Doe was convicted of lewd and lascivious behavior for fondling *himself* in front of children. It appears from the police report that John Doe was masturbating in his vehicle in close proximity to two young girls standing at a school bus stop. He claimed he was unaware that the girls were nearby.

4

O'Brien to first contact DCF's legal department. Following Rios'

recommendation, O'Brien consulted with DCF legal counsel at approximately

2:45 P.M., and was advised to take the children into custody.

At approximately 3:30 P.M., O'Brien proceeded to D.M.'s school. She

interviewed the child and explained that she was going to talk to D.M.'s parents

and siblings and "make sure everybody was okay." O'Brien then arranged for

D.M. to be taken into custody, and attempted to summon a deputy sheriff to

accompany her to Appellants' residence. For reasons unexplained, however, the

deputy never arrived and, after waiting approximately one hour, O'Brien

proceeded to Appellants' residence alone. She arrived there at approximately 5:20

P.M. and, after explaining that she was there to investigate a report of child abuse,

was invited inside by Appellants. O'Brien then proceeded to interview John Doe,

Jane Doe, N.O, and B.O.

At approximately 6:00 P.M., after she had interviewed each member of the

Doe family, O'Brien concluded the children were in danger of abuse from John

Doe. She also concluded that Jane Doe was incapable of protecting the children

and that the children would need to be temporarily removed for their safety.[7] The

---

[7]O'Brien testified she arrived at this conclusion only after interviewing the Does and in light of the evidence she had gathered up to that point, including T.O.'s allegation of abuse, the 1995 DCF report of abuse, and John Doe's criminal past. O'Brien's conclusion that Jane Doe

children were subsequently taken to their maternal grandparents' home, where they remained for the night. The following morning, a state judge concluded there was a lack of probable cause to keep the children apart from their parents, and ordered that all three children be immediately returned to Appellants. Appellants subsequently commenced this action.

II.

A.

Section 39.401(1) governs the state's emergency removal of children who are believed to be in danger of child abuse. It provides in pertinent part:

> (1) A child may only be taken into custody:
>
> . . .
>
> (b) By a law enforcement officer, or an authorized agent of the [DCF], if the officer or authorized agent has probable cause to support a finding:
>
> 1. That the child has been abused, neglected, or abandoned, or is suffering from or is in imminent danger of illness or injury as a result of abuse, neglect, or abandonment[.]

could not adequately protect the children may have been influenced by the 1995 report of abuse indicating that John Doe had abused a three-year old boy whom Jane Doe was babysitting. O'Brien also testified that she was concerned by Appellants' refusal to make any statements concerning allegations of child abuse, and that she found Jane Doe to be "very protective of her husband."

6

Fla. Stat. § 39.401(1).[8]

Consistent with § 39.401(1), DCF's policy is to remove a child from a parent or legal guardian without prior judicial authorization when there is probable cause to believe the child has been abused or is in imminent danger of abuse. Appellants maintain that DCF routinely removes children believed to be in danger of abuse without first attempting to determine whether there is time to obtain a court order before effecting the removal without exacerbating the risk to the child. O'Brien acknowledges that she did not attempt to determine whether there was time to obtain a court order before she removed the Doe children from their parents.

### B.

Appellants asserted in their complaint that § 39.401(1) violates the Due Process Clause of the Fourteenth Amendment and violates the Fourth Amendment (as made applicable to the states through the Fourteenth) by authorizing the warrantless removal of their children. They also asserted that O'Brien violated their constitutional rights when she took their children into custody without prior judicial authorization.

---

[8]In the event the state determines a child needs to be sheltered, a hearing must be held no more than 24 hours after the removal. Fla. Stat. § 39.401(3).

On January 22, 2001, Appellants filed a motion for partial summary judgment seeking: (1) a declaration that § 39.401(1) is unconstitutional; (2) a determination that O'Brien violated their Fourteenth and Fourth Amendment rights; and (3) a determination that O'Brien was not entitled to qualified immunity. On April 9, 2001, the district court issued an order denying Appellants' motion for partial summary judgment. In its order, the court concluded § 39.401(1) comports with due process requirements and comports with the Fourth Amendment.[9] As to the § 1983 claim against O'Brien, the court concluded the central issue was whether there were emergency circumstances warranting her removal of the children without prior judicial approval, and that genuine issues of material fact existed as to that issue. On June 19, 2001, the case proceeded to trial on the § 1983 claim against O'Brien. At the conclusion of Appellants' case in chief, the district court granted O'Brien's motion for judgment as a matter of law on the basis of qualified immunity.

---

[9]Appellants appealed the district court's April 9, 2001, order denying their motion for partial summary judgment. On April 4, 2002, this Court dismissed the appeal for lack of jurisdiction because the district court had not actually resolved the claims for injunctive relief. See 28 U.S.C. § 1291. Subsequently, on June 26, 2002, the district court entered an amended order concluding § 39.401(1) is facially constitutional and that O'Brien did not apply the statute in an unconstitutional manner when she removed the Doe children. Appellants then commenced the instant appeal.

Appellants challenge the district court's dismissal of their constitutional claims and the court's judgment as a matter of law in favor of O'Brien on the issue of qualified immunity.

III.

Before turning to the substantive issues raised on appeal, we first consider whether Appellants have standing to challenge § 39.401(1). The district court determined Appellants had standing to sue, notwithstanding the fact that their children had been returned to them prior to the commencement of this lawsuit. We review that determination *de novo*. *See Maiz v. Virani*, 253 F.3d 641, 654 (11th Cir. 2001).

Article III standing requirements preclude claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant. *Lynch v. Baxley*, 744 F.2d 1452, 1455-56 (11th Cir. 1984). A plaintiff will generally have standing where three criteria are met: (1) the plaintiff has experienced injury in fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) the plaintiff's harm is likely to be redressed should the court order relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992). Appellants' claims in this case easily satisfy the first two criteria. Parents have a fundamental right to the custody of their children, and the

9

deprivation of that right effects a cognizable injury. *See Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982). Furthermore, the injury in this case is clearly traceable to Florida's enactment and enforcement of § 39.401(1).

The third criterion—redressability—presents a greater hurdle for Appellants. The alleged injury—Florida's temporary removal of their children—has already occurred and will not necessarily occur again. *See Los Angeles v. Lyons*, 461 U.S. 95, 105-06, 103 S. Ct. 1660, 1667 (1983) (no redressability in the absence of "a real and immediate threat" that challenged state action will re-occur). Nevertheless, the redressability requirement will usually be satisfied where there is evidence that the plaintiff is likely to encounter the same injurious conduct in the future. *See City of Houston v. Hill*, 482 U.S. 451, 459 n.7, 107 S. Ct. 2502, 2508 n.7 (1987); *see also Lynch*, 744 F.2d at 1456-57 (recognizing that "[p]ast wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction").

Though a close issue, we conclude the redressability requirement is satisfied in this case. DCF has classified John Doe as fitting a "pattern of sexual offenders" and has now investigated him on two separate occasions. Given this classification and history, it seems reasonably likely that Appellants could encounter future state

10

action under § 39.401(1).  Moreover, the Supreme Court has recognized an exception to the basic standing requirement in cases where a plaintiff's claims are "capable of repetition, yet evading review."  *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11, 95 S. Ct. 854, 861 n.11 (1975); *see also Lynch*, 744 F.2d at 1457.  Pretrial detention falls into this category because it is "by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted."  *Gerstein*, 420 U.S. at 110 n.11, 95 S. Ct. at 861 n.11.  The removal of Appellants' children—though not a criminal detention as in *Gerstein*—is nevertheless a form of pretrial detention that will typically have ended by the time a legal challenge can be mounted.  *See* Fla. Stat. § 39.401(3) (requiring a hearing within 24 hours of state's removal of children).  Consequently, any constitutional injury will likely be too fleeting to be redressed and hence qualifies as being capable of repetition yet evading review.

We therefore conclude Appellants have standing to challenge § 39.401(1), and we turn our attention to the merits of that challenge.

IV.

Appellants maintain that § 39.401(1), both facially and as applied, violates their right to due process under the Fourteenth Amendment and their Fourth Amendment right to be free from unlawful search and seizure.  The

11

constitutionality of a statute is a question of law subject to *de novo* review. *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1277 (11th Cir. 2001).

## A.

The Supreme Court has held that parents have a constitutionally protected liberty interest in the care, custody and management of their children. *See Santosky*, 102 S. Ct. at 1397. "As a general rule, therefore, before parents may be deprived of the care, custody or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S. Ct. 1208, 1212 (1972)). "At the same time, however, the State has a profound interest in the welfare of the child, particularly his or her being sheltered from abuse." *Id.* at 593-94. Consequently, courts have recognized that a state may constitutionally remove children threatened with imminent harm when it is justified by emergency circumstances. *See, e.g., Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001); *Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir. 2000); *Tenenbaum*, 193 F.3d at 593-94; *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994); *cf. United States v. Edmondson*, 791

12

F.2d 1512, 1514 (11th Cir. 1986) (allowing warrantless search and seizure in criminal cases where exigent circumstances exist). By limiting warrantless removals to true emergencies, the law "seeks to strike a balance among the rights and interests of parents, children, and the State." *Tenenbaum*, 193 F.3d at 594.

1.

Appellants first contend that § 39.401(1) is facially unconstitutional. In order to prevail on their facial challenge, Appellants must establish that there is *no* set of circumstances under which § 39.401(1) may be constitutionally applied. *Williams v. Pryor*, 240 F.3d 944, 953 (11th Cir. 2001). "This 'heavy burden' makes such an attack 'the most difficult challenge to mount successfully' against an enactment." *Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1329 (11th Cir. 2001) (citation omitted).

Section 39.401(1) authorizes state officials to remove a child without a prior court order only where there is probable cause to believe the child has been abused, neglected, or abandoned, or if there is probable cause to believe the child is in imminent danger of abuse. Appellants complain that DCF routinely removes children on an ostensibly emergency basis without a warrant and without first considering the feasibility of obtaining judicial authorization. In other words, they accuse DCF of treating almost all cases of suspected abuse as emergencies. The

13

effect of this practice, according to Appellants, is the *de facto* elimination of the warrant requirement in derogation of due process.

The problem with this argument—as far as Appellants' facial challenge is concerned—is that it is aimed at DCF's *application* of § 39.401(1). Section 39.401(1) authorizes the state's warrantless removal of children in cases where the child is believed to be in imminent danger of abuse. Although Appellants contend that DCF has artificially inflated the meaning of "imminent danger," the *face* of the statute is silent as to what circumstances may reasonably be considered to constitute "imminent danger." As Appellants have themselves acknowledged, it is *possible* to apply § 39.401(1) in a manner that does not offend due process. By definition, then, § 39.401(1) is not facially unconstitutional.

2.

a.

Appellants' as-applied challenge—like their facial challenge—hinges on their argument that O'Brien's warrantless removal of their children was not actually supported by emergency circumstances and therefore violated due process. The issue boils down to how we define an emergency.[10] Appellants

---

[10]The term "emergency" as used in this context is synonymous with "exigency" and "imminent danger." We have found that courts use them interchangeably. *See, e.g., Mabe*, 237 F.3d at 1106 ("Government officials are required to obtain prior judicial authorization before

assert an emergency must be defined by reference to the feasability of obtaining a court order before effecting a removal. Stated differently, they argue that if there is time to obtain a court order without exacerbating the risk to the child, then there can never be an emergency and the state must obtain a court order no matter how emergent the child's circumstances otherwise appear. They would have us craft a rule that reads something like this: *Due process requires that a state official obtain a court order prior to removing a suspected victim of child abuse from parental custody, unless: (1) the official has probable cause to believe the child is in imminent danger of abuse;* and *(2) the official reasonably determines that there is insufficient time to obtain judicial permission before temporarily removing the child.*

We are not persuaded that due process demands such an inflexible rule. Aside from our concerns about imposing a new and onerous burden on child welfare agencies, many of which already operate under considerable strain, we do not believe that the single focus of a due process analysis ought to be on the

---

intruding on a parent's custody of her child unless they possess . . . reasonable cause to believe that the child is in imminent danger . . . .") (quotation omitted); *Brokaw*, 235 F.3d at 1020 (stating that due process requires "that government officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances"); *Tenenbaum*, 193 F.3d at 594 ("In emergency circumstances a child may be taken into custody by a responsible State official without court authorization or parental consent.") (quotation omitted).

court's schedule. Due process is a flexible concept, and "what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Stanley*, 405 U.S. at 650-51, 92 S. Ct. at 1212 (quotation omitted). In order to properly define the interests at stake and weigh their relative importance, courts should be allowed to consider *all* relevant circumstances, including the state's reasonableness[11] in responding to a perceived danger *as well as* the objective nature, likelihood, and immediacy of danger to the child. Having considered all relevant factors, courts may then decide whether an objectively imminent danger justified the state's removal of a child without prior judicial authorization.

None of the cases cited by Appellants—with one exception which we will address— supports the proposition that a child welfare worker must specifically determine whether there is time to obtain a court order before conducting an emergency removal. To the contrary, these cases simply recognize—as we do— that a state may not remove a child from parental custody without judicial

---

[11]We recognize that it is important for courts to scrutinize officials' conduct as well as the objective danger to the child. Otherwise, child welfare workers could conceivably manufacture an emergency by unreasonably failing to act until it became necessary to remove a child from parental custody without prior court authorization. But officials' conduct is only one of several relevant factors that may be considered.

16

authorization unless there is probable cause to believe the child is threatened with imminent harm. *See, e.g., Roska v. Peterson*, 304 F.3d 982, 993 (10th Cir. 2002) (recognizing that while "the mere possibility of danger" does not justify a warrantless removal, "emergency circumstances which pose an immediate threat to the safety of a child" do); *Brokaw*, 235 F.3d at 1020 (observing that due process requires "that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances"); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000) ("Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."); *Hollingsworth*, 110 F.3d at 739 ("Removal of children from the custody of their parents requires pre-deprivation notice and a hearing 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'") (citation omitted); *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 393 (4th Cir. 1990) ("Due process does not mandate a prior hearing in cases where emergency action may be needed to protect a child.").

17

Contrary to Appellants' position, none of these cases held that imminent danger must be defined by reference to a court's schedule.

Only the Second Circuit seems to have taken a position fully consistent with Appellants' argument. In *Tenenbaum v. Williams*, a two-to-one panel decision, the court held a social worker could not temporarily remove a child from her parents' custody without prior judicial authorization unless there was probable cause to believe the child was in imminent danger of abuse *and* the social worker reasonably determined there was insufficient time to obtain a court order before removing the child from danger. 193 F.3d at 596.

In *Tenenbaum*, an employee of the New York City Child Welfare Administration (CWA) removed five-year-old Sarah Tenenbaum from school several days after Sarah's teacher first reported noticing signs of abuse. CWA officials, without consulting legal counsel, took Sarah into custody for the express purpose of physically examining her to rule out the possibility of abuse. *Id.* at 590. After an examination uncovered no signs of abuse and Sarah was returned home, her parents brought suit against the City and the individual CWA employees responsible for Sarah's removal. *Id.* at 591. Their suit alleged a number of constitutional violations, including a violation of their procedural due process rights based on the removal of their daughter without prior court

18

authorization. *Id.* at 592. The district court granted summary judgment for the defendants on the procedural due process claim, finding Sarah's removal was justified by emergency circumstances. *Id.*

On appeal, the Second Circuit held the district court erred in failing to specifically consider whether CWA workers had enough time obtain a court order before they removed Sarah. *Id.* at 594-95. The court reasoned:

> If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent; there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child. If, irrespective of whether there is time to obtain a court order, all interventions are effected on an "emergency" basis without judicial process, pre-seizure procedural due process for the parents and their child evaporates.

*Id.* at 594-95 (footnote omitted).

Consequently, the court held that "it is unconstitutional for state officials to effect a child's removal on an 'emergency' basis where there is reasonable time safely to obtain judicial authorization consistent with the child's safety." *Id.* at 596.

Applying this standard to the facts of *Tenenbaum*, the Second Circuit observed that CWA employees routinely failed to consider whether there was time to obtain court authorization before taking children—and did not do so in Sarah's

19

case. *Id.* at 591, 595. Thus, the court concluded the plaintiffs could demonstrate a violation of their procedural due process rights.[12] *Id.* at 595.

The dissenting member of the panel in *Tenenbaum* argued that the unintended consequence of the majority's rule would be to force child welfare workers to always obtain a warrant, tipping the constitutional balance away from the state's paramount interest in protecting children. He explained:

> Every time a child welfare worker has reason to suspect child abuse, she will have to consider (i) whether there is reason to believe the child is in imminent danger (which until now has been all that was required) *and* (ii) whether there is time to get to court and obtain a court order (the majority's new requirement) *as well as* (iii) whether a court or jury will second-guess that decision on the basis that more efficient decision-making would have afforded sufficient time to obtain the court order. In terms of litigation, individual liability and damages, an error on the side of removal is risky, while an error on the other side is safe.

*Id.* at 611 (Jacobs, J., dissenting).

The dissent also criticized *Tenenbaum* as representing a dramatic departure from previous Second Circuit precedent:

> The majority opinion announces a new and incompatible principle: that there is no such emergency, notwithstanding the exigency, if there is or may be time to obtain a court order. None of our cases has held that the availability of the emergency-removal exception depends on whether there is time to obtain judicial pre-authorization.

---

[12]Despite finding evidence of a constitutional violation in *Tenenbaum*, the Second Circuit upheld the dismissal of the claims against the individual defendants based on qualified immunity. *Tenenbaum*, 193 F.3d at 596.

> *Each of our prior cases requires only that an emergency exist, a fact that is determined by reference to the child's peril, not the case worker's schedule or the court's calendar.* This is a sensible formulation, and one that keeps the child welfare worker focused on what matters first in these cases, the child's precarious welfare. When a child's safety is threatened, that is justification enough for action first and hearing afterward.

*Id.* at 608 (Jacobs, J., dissenting) (quotation omitted) (emphasis added).

We agree that the sole focus should not be whether there is time to obtain a court order. The Second Circuit's holding in *Tenenbaum*, which seems "so measured and reasonable in the pages of a federal appellate opinion, will work serious harm in an exceptionally sensitive area of state responsibility." *Id.* at 610 (Jacobs, J., dissenting).[13] As we have previously alluded to, due process is a flexible concept—particularly where the well-being of children is concerned—and deciding what process is due in any given case requires a careful balancing of the interests at stake, including the interests of parents, children, and the state. Those

---

[13]We also note some important factual distinctions between *Tenenbaum* and the instant case. In *Tenenbaum*, child welfare workers admitted their motivation in removing Sarah was to examine the child in order to *rule out the possibility of abuse*, rather than to protect her from any imminent danger of abuse. 193 F.3d at 590. Moreover, there was an unexplained day-long delay between the decision to remove Sarah from school and her actual removal. *Id.* Finally, child welfare workers did not seek legal advice despite the availability of CWA lawyers. *Id.* Thus, while we disagree with the Second Circuit in terms of how emergency circumstances should be defined, we agree with that court's conclusion that the circumstances in *Tenenbaum* did not demonstrate an emergency sufficient to obviate the need for a warrant. In contrast, the record in this case shows that O'Brien removed the Doe children in order to protect them from what she believed to be imminent danger of abuse, consulted with legal counsel, and acted swiftly once the decision was made to remove the children.

interests may be implicated to varying degrees depending on the facts of an individual case, which will necessarily affect the degree of procedural due process required. This kind of subtle balancing cannot be properly accomplished when courts blunt the inquiry by simply asking whether there was time to get a warrant.

The only other case we are aware of that even arguably supports tying the definition of emergency to a court's calendar is the Ninth Circuit's opinion in *Mabe*. In *Mabe*, the court upheld a due process challenge to county officials' warrantless removal of the plaintiff's daughter. 237 F.3d at 1109. The court observed, "Assuming that [a county social worker] could obtain a warrant the same day as the case review committee recommended that MD be removed, it is difficult to understand how the further delay of a few hours necessary to obtain the warrant would have put MD in imminent danger of serious physical injury." *Id.* at 1108 (footnote omitted). But *Mabe* did not indicate that county social workers had to ascertain specifically whether there was time to get a warrant prior to removing the child from imminent danger. *Id.* Instead, the court considered *several* factors before concluding the removal in that case violated due process. These included the county's unexplained month-long delay in removing the child once it became aware of the danger, its awareness that there had been no abuse for at least a month, and the likelihood that the suspected abuse did not involve

22

violence or penetration. *Id.* Thus, *Mabe*, like the majority of other cases that have considered the issue, actually examined all relevant circumstances before concluding due process in that case demanded a pre-deprivation hearing.

b.

In light of the relevant circumstances in this case, we conclude there is no question but that there was an objectively imminent danger to the Doe children so as to justify O'Brien's temporary removal of the children without prior court authorization. O'Brien received two documented reports of severe sexual abuse involving John Doe, one of which involved a disabled family member and both of which involved extremely young children. She also received a report from the FDLE documenting John Doe's criminal past, including a conviction for lewd and lascivious behavior around children.[14]

Furthermore, the record demonstrates that O'Brien responded reasonably and swiftly as soon as she became aware of the possible danger to the Doe children. This is not a case where a social worker manufactured an emergency in order to circumvent judicial participation. *Cf. Mabe*, 237 F.3d at 1105, 1109

---

[14]Although O'Brien may have misconstrued parts of the FDLE report—including her apparently erroneous conclusion that John Doe had been convicted of "child fondling"—it was not unreasonable for her to infer that John Doe had some dangerous proclivities based on his undisputed criminal record.

(failure to obtain court order could not be excused by emergency circumstances where over one month elapsed between the report of child abuse and social worker's eventual removal of the child). Here, O'Brien investigated diligently and acted almost immediately after the relevant facts came to her attention. At the same time, she did not rush to judgment or react impulsively. Rather, she consulted with both her supervisor and DCF legal counsel before taking steps toward removing the Doe children. *See Holllingsworth*, 110 F.3d at 741 (suggesting that an emergency removal is more likely to be objectively reasonable where defendant relied on advice of counsel); *cf. Tenenbaum*, 193 F.3d at 591 (noting defendant's failure to consult with "readily available" legal counsel prior to effecting emergency removal of Sarah Tenenbaum). Even then, O'Brien did not remove the children until after she interviewed both the parents and children and determined the children were unsafe. In short, while it is almost always possible to criticize an official's conduct in hindsight, we conclude O'Brien's actions in this case were nearly unassailable. We therefore hold O'Brien's warrantless removal of the children did not violate Appellants' right to due process.

B.

Appellants also contend that § 39.401(1) and O'Brien's application of it violated their Fourth Amendment right to be free from unreasonable searches and

seizures.  Appellants acknowledge that their Fourth Amendment claims mirror their procedural due process claims in that the seizure of the children was not unconstitutional if supported by exigent circumstances.[15]  *See Wallis*, 202 F.3d at 1137 n.8; *Tenenbaum*, 193 F.3d at 605.  For the same reasons that Appellants cannot demonstrate a procedural due process violation, neither can they demonstrate a Fourth Amendment violation.

## V.

Appellants also challenge the district court's determination that O'Brien was immune from suit.  In weighing a state official's qualified immunity defense, we conduct a two-part inquiry.  First, we ask whether the official's conduct violated a constitutional right.  Only if it did do we reach the second question of whether the right was clearly established at the time the conduct occurred so as to overcome the immunity defense.  *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  We have determined that O'Brien did not violate Appellants' constitutional rights.  We therefore need not engage in the second part

---

[15]Additionally, insofar as Appellants may be challenging O'Brien's warrantless entry into their home, the record demonstrates that they gave her consent to enter.  Under those circumstances, a warrantless entry does not violate the Fourth Amendment.  *See Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990).  Even if Appellants had not given O'Brien consent to enter their home, the warrantless entry was justified in this case by exigent circumstances.

of the qualified immunity analysis, and we affirm the district court's judgment in favor of O'Brien.

VI.

In conclusion, we hold Appellants have standing to challenge § 39.401(1) because they are reasonably likely to suffer another removal under the statute, and the conduct at issue is capable of repetition yet evading review. As to the merits of that challenge, we hold that § 39.401(1) is not facially unconstitutional because it permits the removal of children without a court order only in an emergency. Nor was § 39.401(1) applied to Appellants in this case in an unconstitutional manner. In light of all the relevant circumstances, O'Brien had probable cause to believe the Doe children were in imminent danger of abuse. Therefore, she did not violate the Constitution when she temporarily removed the children from their parents without a court order. Moreover, where plaintiffs have failed to demonstrate a violation of their constitutional rights, a defendant government official is entitled to qualified immunity. Accordingly, we hold that the district court did not err in granting O'Brien judgment as a matter of law.

AFFIRMED.