**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JACINTO ARREDONDO and
MARISELA OLIVAS,

      Plaintiffs-Appellants,

v.

NAOMI LOCKLEAR, REBECCA
BERRERA-GARCIA, MIKE PITTS,
and RUDY ARREY,

      Defendants-Appellees.

No. 05-2237

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CIV-03-156 KBM/LCS)**

---

Michael Newell of Heidel Samberson, Newell, Cox & McMahon, Lovington, New
Mexico, for Plaintiffs-Appellants.

Sean Olivas (Lynn E. Mostoller with him on the brief) of Keleher and McLeod,
PA, Albuquerque, New Mexico, for Defendant-Appellee Naomi Locklear.
Richard E. Olson, Joel M. Carson, and Derek L. Brooks of Hinkle, Hensley,
Shanor & Martin, LLP, Roswell, New Mexico, and Barney James Reeves of
Reeves & Reeves, PA, Las Cruces, NM, for Defendants-Appellees Rebecca
Berrera-Garcia, Mike Pitts, and Rudy Arrey.

---

Before **HENRY**, **LUCERO**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Few decisions by state officials are as wrenching as the decision to remove a child from a home based on suspicion of parental abuse. The competing constitutional interests are so powerful that courts have struggled to find adequate superlatives. On one hand, the state's interest in shielding children from abuse is "transcendent," *Maryland v. Craig*, 497 U.S. 836, 855 (1990) (internal quotation marks omitted), "compelling," *Globe Newspaper Co. v. Super. Ct. for Norfolk County*, 457 U.S. 596, 607 (1984), "of the highest order," *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984),"of surpassing importance," *New York v. Ferber*, 458 U.S. 747, 757 (1982). On the other hand, parents' interest in raising their children free from government interference is "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), "cardinal," *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), "an enduring American tradition," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972),"perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

The state's failure to act on reasonable suspicion of abuse can have unthinkable consequences for the children: physical injury, emotional scarring, a lifetime of recovery, disease, dysfunction, or death. But false positives can carry

grave and irreversible consequences as well: anguish for the family, public humiliation, developmental setbacks for the children, distrust, or divorce.

In this case, we revisit the constitutional standard for determining whether state officials may remove children from a home, consistent with procedural due process, without affording the parents advance notice or a hearing. Based on our recent decision in *Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006), we hold that police and social workers in this case had "'reasonable and articulable suspicion that the child[ren] ha[d] been abused or [were] in imminent peril of abuse.'" *Id.* at 1129 (quoting *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 20 (1st Cir. 2001)). We therefore affirm the decision of the district court granting summary judgment to the Defendants.

## I. Factual and Procedural Background

The Plaintiffs, Jacinto Arredondo and Marisela Olivas, have two children, Ashley and Jasmine. On February 14, 2001, Ms. Olivas brought Jasmine, then eleven months old, to the emergency room at Artesia General Hospital in Artesia, New Mexico. Ms. Olivas reported that Jasmine was having difficulty crawling, and X-rays revealed a single fracture in her left arm. When asked how the injury occurred, Ms. Olivas offered two different explanations: that Jasmine had been "trying to crawl and the arm buckled," App. 27, and that Jasmine "had a fall from the bed the day before," App. 41. The physician assistant who first saw Jasmine, Gary Boone, found her injury "inconsistent with this explanation" because "[t]he

- 3 -

fracture [was] too high up" and "[i]f she had fallen and tried to catch herself then she would have more than likely broken both bones in her arm." App. 42. Dr. William Baggs, an orthopedic surgeon who treated Jasmine that day, also found Ms. Olivas's story "slightly confusing" and a "red flag." *Id.* at 27–28. A complete "babygram" (a set of X-rays from head to toe) revealed no other fractures, however, and neither P.A. Boone nor Dr. Baggs made a report to the New Mexico Children, Youth and Families Department (CYFD).

Four days later, on the night of February 18, 2001, Ms. Olivas again brought Jasmine to the emergency room, this time because Jasmine could not put weight on her left leg. Dr. Baggs also examined Jasmine on the morning of February 19. An X-ray revealed "some fuzziness" and a "periosteal reaction consistent with a healing injury." *Id.* at 28. Ms. Olivas attributed the injury to the same fall from the bed. ("Mom said this occurred at the same time.") *Id.* Based on Ms. Olivas's "conflicting stories" and the fact that Jasmine had suffered two injuries requiring emergency care within four days, nurse-practitioner Joann Vandergriff and Dr. Baggs each made referrals to CYFD on February 19. *Id.* at 23, 26. The CYFD intake report for Ms. Vandergriff's referral states that she "suspect[ed] possible PA [physical abuse] and/or PN [physical neglect] of child." *Id.* at 118. Dr. Baggs's notes reflect the same concerns: "two injuries in this 11 month old raises the question of child abuse." *Id.* at 28. His report also "stat[ed]

that the left femur was broken," *id.* at 144, although the hospital's X-rays showed no fracture, *id.* at 289.

CYFD coded the case "P-1," a non-emergency designation requiring action within twenty-four hours, and two social workers were assigned to the investigation. Defendant Naomi Locklear was given overall responsibility for Jasmine's case, but due to her absence on February 19, Defendant Rebecca Barrera-Garcia was charged with initiating action. Shortly before the twenty-four hour deadline expired on February 20, Ms. Barrera-Garcia contacted another Defendant, Detective Rudy Arrey of the Artesia Police Department, for assistance.

Together they visited the hospital. Nurse Vandergriff was not available, but they spoke with physician assistant Boone, who had seen Jasmine on February 14. He recounted his reasons for suspicion regarding the fractured arm, adding that "[i]t look[ed] as if she were grabbed and pulled," *id.* at 42, using a "torquing motion," *id.* at 52. He also reiterated that, contrary to Dr. Baggs's report, X-rays taken at the hospital had detected "no injury . . . around the left hip or upper thigh." *Id.* at 144. Next they proceeded to the Plaintiffs' home. At first, Ms. Olivas refused to speak with Detective Arrey, citing concern about her probation on a fraud conviction for "playing with counterfeit money," but after speaking with her parole officer she allowed them inside. *Id.* at 42. Ms. Barrera-Garcia and Detective Arrey examined the bed from which Jasmine reportedly had fallen.

It was only "2 ½ to 3 feet off the floor," and the floor beneath was covered in "thick maroon carpet." *Id.* at 144.

Detective Arrey decided to remove Jasmine from her parents' custody immediately. He based his decision on the two injuries, Ms. Olivas's conflicting explanations, and the implausibility of Ms. Olivas's story that a short fall onto a carpeted floor caused both a broken arm and a broken leg. Understandably, Ms. Olivas became "angry and upset." *Id.* She was "a good mother," she said, and if she was a child abuser, "why didn't Jasmine have bruise[s] all over her"? *Id.* She begged them not to take Jasmine away, and told him "they were falsely accusing me of something that was not true." *Id.* at 152. He told her to "calm down." *Id.* at 144.

Detective Arrey decided to remove Ashley, who was then five years old, at the same time. He had learned, at a training class sponsored by CYFD, that "if one of the children is in harm, then when it's taken out of the home, then the abuse goes to the other child or children." *Id.* at 139. In his experience, it was "common practice that all the children have to be taken" when there is a risk that any child in a home has suffered abuse. *Id.* Ms. Barrera-Garcia disagreed. Based on her own conversation with Ashley, during which Ashley showed no signs of injury and "reported no abuse," she concluded that Ashley "was fine." *Id.* at 277. She therefore refused to take custody of Ashley. Detective Array was "frustrated and angry" with that decision because, in his view, both children were "at risk of

being abused by their caretakers." *Id.* at 217. That day, CYFD removed only Jasmine from the Plaintiffs' home, giving custody to Ms. Olivas's sister, Yolanda Dueñez.

The next morning, February 21, Ms. Locklear returned to work and expanded the investigation. She contacted Dr. Baggs, who described Jasmine's injury as "suspicious for a healing fracture" and "a red flag." *Id.* at 216. She then conducted a lengthy phone interview with Ms. Olivas, who described the events surrounding Jasmine's fall from the bed. She also learned from Detective Arrey that Mr. Arredondo had a felony conviction for cocaine trafficking. Around noon, Ms. Locklear held a staff meeting, joined by Ms. Barrera-Garcia, their supervisor, and a CYFD attorney. They agreed that Jasmine faced "an immediate risk of harm," *id.* at 211, and decided to place her in foster care immediately, out of concern that Ms. Olivas's sister would not do enough to prevent the Plaintiffs from visiting and physically abusing Jasmine.

The staff also agreed to remove Ashley on a "targeted child" or "scapegoat" theory. According to Ms. Locklear, it is "very common" for abusive families to "target[] one child" who "gets the brunt of the abuse." *Id.* at 310. When the targeted child is removed, leaving "no one else in the home for them to abuse," the abuse shifts to other children. *Id.* It was agreed at the staff meeting that Jasmine was "the most needy, the most demanding" child in the Plaintiffs' home, and that if she were removed, "Ashley could . . . become the scapegoat." *Id.* The

staff also relied upon computer software called "structure [sic] decision making (SDM)," which, according to the Defendants, "objectively assessed and confirmed Ms. Locklear's belief as to the level of risk faced by Jasmine and Ashley." Locklear Response Br. 9. Although Ms. Barrera-Garcia continued to believe that there was no "emergency situation," App. 401, and that there was no reason "on either the 20th or the 21st why a court order could not have been obtained," *id.* at 345, she apparently did not voice her dissent at the meeting.

Early that afternoon, Ms. Barrera-Garcia and a fourth Defendant, Administrative Sergeant Mike Pitts, went to Ashley's school. They found Ms. Olivas there, and provided her with two documents: (1) a "Statement of Reasonable Grounds," informing her that Sergeant Pitts was taking Jasmine and Ashley into custody because he had "reasonable grounds" to believe that they were "suffering from an illness or injury as a result of alleged abuse or neglect . . . and/or . . . [were] in danger from [their] surroundings," *id.* at 402; and (2) a "Notice to Parents of Physical Custody," informing her that Jasmine and Ashley had been taken into custody "as alleged neglected or abused . . . children" and requiring CYFD to file a petition alleging neglect or abuse by February 23 or release them, *id.* at 184. They took custody of Ashley and placed her in foster care.

On February 23, a state district court issued an *ex parte* order finding probable cause to believe that both Jasmine and Ashley were "abused or

neglected" under New Mexico law. *Id.* at 234. Six days later, on March 1, the Plaintiffs and their attorney attended a custody hearing before the same judge. Again the court upheld CYFD's custody, finding probable cause to believe that "the children will be subject to injury by others if not placed in the custody of the Department." *Id.* at 241.

On March 6, Dr. Baggs contacted CYFD and reported that he had misdiagnosed Jasmine's leg injury. Rather than a fracture, she had suffered a septic hip, a serious bacterial infection that requires immediate surgery to avoid permanent damage to the hip joint. He told CYFD that he feared malpractice liability because Jasmine "might walk with a limp and have life-long complications." *Id.* at 230. He also recanted his earlier report to CYFD, making clear that "he had no concerns regarding suspected child abuse or neglect." *Id.*

Initially CYFD was unimpressed. Based on Ms. Olivas's unsatisfactory explanation for the first injury, as well as other "concerns with Ms. Olivas' parenting skills," Ms. Locklear decided to retain custody of both children indefinitely. *Id.* For reasons that are unclear, however, CYFD reversed course two weeks later, and released both children to their parents' custody on March 21.

Mr. Arredondo and Ms. Olivas filed suit under 42 U.S.C. § 1983, alleging that the removal of their children without notice and a hearing violated their procedural due process rights. On cross-motions for summary judgment, the

Defendants argued not only that their actions were justified by "'emergency circumstances which pose an immediate threat to the safety of the child,'" *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1245 (10th Cir. 2003) (quoting *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997)), but that they were entitled to qualified immunity. The district court agreed on both counts, holding that the Plaintiffs had failed to show any genuine issues of material fact as to the existence of a constitutional violation, and that in any case the law was not "clearly established" such that the Defendants had fair warning that their conduct was unlawful. Mem. Op. 38.

When a defendant raises the defense of qualified immunity, we must consider two questions: "(1) whether the alleged conduct violated a constitutional right, and if so, (2) whether the law was clearly established at the time of the defendant's actions." *Shrum v. City of Coweta*, 449 F.3d 1132, 1138 (10th Cir. 2006) (quoting *Saucier v. Katz*, 533 U.S. 194, 121 (2001)). We must first resolve whether a constitutional violation occurred because, "'in the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.'" *Harman v. Pollock*, 446 F.3d 1069, 1077 (10th Cir. 2006) (quoting *Saucier*, 533 U.S. at 201). We review the district court's grant of summary judgment on the basis of qualified immunity *de novo*, and affirm only if the record reveals no genuine issue of material fact, such

that the moving party is entitled to judgment as a matter of law. *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1142 (10th Cir. 2006).

## II. Discussion

The Supreme Court has held that under the Fourteenth Amendment, parents enjoy a protected liberty interest "in the care, custody, and control of their children." *Troxel*, 530 U.S. at 65. State officials therefore may neither permanently terminate parental rights, *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982), nor temporarily remove children from a home, *Roska*, 328 F.3d at 1245, without affording the parents due process of law.

Ordinarily, due process requires that the state provide parents with "predeprivation notice and a hearing"—that is, notice and an opportunity to be heard *before* state officials remove children from the home. *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997). Given the state's powerful countervailing interest in protecting children from abuse and neglect, however, we have long recognized that "'extraordinary circumstances'" may justify the state in "'postponing the hearing until after the event.'" *Spielman v. Hildebrand*, 873 F.2d 1377, 1385 (10th Cir. 1989) (quoting *Smith v. Org. of Foster Families for Equality and Reform*, 431 U.S. 816, 848 (1977)). Faced with "emergency circumstances which pose an immediate threat to the safety of a child," the state may "temporarily deprive a parent of custody without parental consent or a court

order." *Hollingsworth*, 110 F.3d at 739. For such a procedure to comport with due process, of course, the state must provide a prompt postdeprivation hearing.

Following the order of operations set forth in *Saucier*, we first consider whether there are genuine issues of material fact as to the existence of a constitutional violation, and then consider whether the law was clearly established at the time of the Defendants' actions.

## A. Constitutional Violation

In *Gomes v. Wood*, 451 F.3d 1122, 1129 (10th Cir. 2006), this Court adopted a "reasonable suspicion" standard for determining whether emergency circumstances justify the removal of a child from a home without notice and a hearing. Under that standard, state officials must have "'evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.'" *Id.* (quoting *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 20 (1st Cir. 2001)). Although we give some consideration to "whether state officials might obtain judicial authorization of the removal without additional risk to the child," *id.* at 1130-31, we take care not to make this factor the "'single focus' of the inquiry," *id.* at 1130 (quoting *Doe v. Kearney*, 329 F.3d 1286, 1295 (11th Cir. 2003)). Among the standards proposed by various courts of appeals, we concluded, this standard best "balances the interests of the parents, the child, and the state." *Id.*

Because *Gomes* is our only case decided under the reasonable suspicion standard, a brief review of its facts is in order. In April 2000, Shauna Gomes took her nine-month-old daughter Rebekah to a pediatrician for diagnosis of a head injury, and told the doctor that Rebekah had fallen from the bed the previous day. *Id.* at 1124. X-rays revealed a skull fracture, but the shape of the fracture "suggested to [the doctor] that it had been caused by a blunt trauma." *Id.* He told Ms. Gomes that he was required to make a report to the state Division of Child and Family Services, but sent her home with a prescription for Motrin. *Id.* In his report to the agency, he said that Ms. Gomes's explanation of the injury was "suspicious" but "possible," noting that the fracture was "consistent with a fall on a flat object." *Id.* He was also concerned that Ms. Gomes had waited until the next day to seek medical attention. *Id.* The intake worker said that "because the matter did not appear to be an emergency," an investigator would call back the next day. *Id.* at 1125. No one called—in fact, no one took any action—until Ms. Gomes returned for a follow-up visit with Rebekah and asked the doctor whether he had contacted Child and Family Services yet. *Id.* That day the doctor finally spoke with a social worker about Rebekah's injuries. Based on the seriousness of the injury, the doctor's suspicions about the explanation, and the delay in seeking medical attention, state officials decided to conduct a home visit. *Id.* When a social worker and police officer finally observed the bed and floor, two days later, they found Ms. Gomes's explanation implausible and immediately removed

Rebekah from her parents' custody, without notice or a hearing. *Id.* at 1126. After four months in state custody, the agency decided that Rebekah should be returned to her family. *Id.*

Based on those facts, we held that the record supported Ms. Gomes's claim that state officials lacked "reasonable and articulable suspicion" that Rebekah "ha[d] been abused or [was] in imminent peril of abuse." *Id.* at 1135. The doctor "never was highly suspicious that Rebekah had been the victim of child abuse," and his report specifically stated that her fracture was "consistent with a fall on a flat object." *Id.* Both the doctor and the intake worker at the agency saw no imminent peril of abuse, as the doctor felt "comfortable" sending the child home and the agency took no action for two days. *Id.* Most strikingly, it was Ms. Gomes herself who reminded the doctor about the need for consultation with Child and Family Services, kickstarting an investigation that the state apparently had abandoned. Her actions therefore were "arguably inconsistent with that of a neglectful or abusive parent." *Id.* Taking the evidence in the light most favorable to the plaintiffs, we held that genuine issues of material fact existed as to whether "the defendant officials removed Rebekah without 'reasonable and articulable suspicion.'" *Id.* (quoting *Hatch*, 274 F.3d at 20).

In this case, by contrast, we find that the evidence available to state officials was sufficient to create reasonable suspicion that Jasmine had been abused, and that Ashley was in imminent peril of abuse. Because that evidence

- 14 -

differs with respect to each of the children, we separately discuss whether genuine issues of material fact preclude summary judgment as to Jasmine and Ashley.

### 1. *Jasmine*

The rationale for intervention in Jasmine's case was much clearer than in Ashley's. The Defendants had ample evidence giving rise to a reasonable and articulable suspicion that Jasmine had been abused or was in imminent danger of abuse. In a period of four days, she had suffered two injuries requiring emergency care, one of which appeared to have resulted from a sharp grab or "torquing motion." App. 52. Ms. Olivas had offered conflicting stories about how the injuries occurred, and Dr. Baggs and physician assistant Boone believed that her explanation could not be squared with the X-rays of Jasmine's arm. Nurse Vandergriff and Dr. Baggs reported their concerns about child abuse to CYFD independently, fulfilling a statutory duty to "report the matter immediately" whenever they "know[] or ha[ve] a reasonable suspicion that a child is an abused or neglected child." N.M.S.A. § 32A-4-3(A). Unlike the doctor's report in *Gomes*, Dr. Baggs's report unequivocally cited suspicions of child abuse. Although the Defendants knew that one set of X-rays had found nothing wrong with Jasmine's leg, they had another report from Dr. Baggs that reached the opposite conclusion, diagnosing the injury as a fracture and calling it "suspicious" and "a red flag." App. 216. The fact that his diagnosis ultimately proved incorrect does not render the Defendants' reliance on it unreasonable.

Finally, during a visit to the home, two of the Defendants inspected the bed from which Jasmine fell, and found it highly unlikely that a short drop onto thick carpet could have caused such serious injuries. Under the circumstances, there is no question that the Defendants had a reasonable and articulable basis for suspicion of abuse with respect to Jasmine.

The Plaintiffs rely heavily on two statements by Ms. Barrera-Garcia. First, Ms. Barrera-Garcia says that she did not believe—apparently at any time—that Jasmine faced an "emergency situation." *Id.* at 401. Yet Ms. Barrera-Garcia was only one member of the team of social workers that agreed on February 21 that "Jasmine was still in immediate danger of harm," and she apparently did not share her reservations with her colleagues, either before or after the staff meeting. *Id.* at 211. Her statement is also difficult to reconcile with her actions: she found the situation urgent enough, on the afternoon of February 20, to remove Jasmine from the home immediately. In any case, Ms. Barrera-Garcia's subjective belief that the situation was not an "emergency" does not change the fact that the Defendants had an objectively reasonable basis to suspect that Jasmine had been abused or faced imminent peril of abuse. Under *Gomes*, reasonable suspicion is enough.

Second, the plaintiffs quote Ms. Barrera-Garcia as saying that there was no reason "on either the 20th or the 21st why a court order could not have been obtained." App. 345. As we made clear in *Gomes*, "the question of whether state officials had time to seek and obtain authorization for the removal without

jeopardizing the safety of the child will be an important consideration" when determining whether the circumstances justify the removal of a child without notice and a hearing. *Gomes*, 451 F.3d at 1131. But as a practical matter, this factor can be difficult to evaluate: "it may not be entirely clear either how long it would take to obtain judicial approval or whether this period of delay would jeopardize the safety of the child." *Id.* at 1130. Accordingly, to facilitate the "'subtle balancing'" required in child-removal cases, we take care not to "'blunt the inquiry by simply asking whether there was time to get a warrant.'" *Id.* (quoting *Kearney*, 329 F.3d at 1297-98). We treat this factor as "an important consideration," but not our "'sole focus.'" *Id.* at 1130–31 (quoting *Kearney*, 329 F.3d at 1295).

Although one member of the team investigating Jasmine's situation, Ms. Barrera-Garcia, stated her opinion that there was no reason why a court order could not have been obtained, she provided no information about (1) the amount of time typically required to obtain a warrant, or (2) her reasons for believing that the "immediate danger of harm" to Jasmine did not require "immediate" removal. By contrast, Ms. Locklear's affidavit states that CYFD's "'SDM' (or Structured Decision Making)" software concluded that the children "should be removed from the home pending a 48-hour *ex parte* order." App. 211. This demonstrates that the decisionmaking process of the team as a whole evaluated the imminence of harm to Jasmine against the benchmark of the time it would take to obtain an *ex*

- 17 -

*parte* order, as it should, leading to the conclusion that immediate removal was necessary. Where, as here, the child had sustained two serious injuries in four days, without plausible explanation, the team was justified in believing that delay of even a brief duration could be calamitous. Taking into account "all relevant circumstances," one participant's opinion that a court order could have been obtained is insufficient to show that the decision to remove Jasmine from the home immediately falls short of the "reasonable suspicion" standard. *See Gomes*, 451 F.3d at 1131.

### 2. *Ashley*

In Ashley's case, the question of "reasonable suspicion" is much closer. The only basis for removing Ashley from the home was the "targeted child" or "scapegoat" theory. The best description of this theory comes from the affidavit of Dr. Karen Campbell, a doctor consulted by CYFD concerning Jasmine and Ashley. She explains:

> My reported concern of risk towards Ashley, the older child, was based on my training and experience. Studies show that siblings of abused children have a higher abuse rate than in the general population. Because studies show that abuse or serious concerns of abuse exist in nearly half of the families in which another sibling had been previously abused, I believe it was necessary and essential to remove Ashley from the home.

App. 245. Ms. Locklear, Detective Arrey, and Sergeant Pitts each echoed that description of the theory, adding that they based their decision on their own

- 18 -

"training and experience." According to Ms. Locklear, the "targeted child" scenario is "very common." *Id.* at 310.

Despite its apparent prevalence in discussions of child abuse among these state officials, the theory seldom has been invoked before the courts. Only one federal court has considered whether a "targeted child" or "scapegoat" theory justifies removal of children from a home without notice and a hearing. *See Taylor v. Evans*, 72 F. Supp. 2d 298, 309 (S.D.N.Y. 1999) (finding it "not unreasonable" for a social worker to remove all three children from a home where one child had sustained serious injuries, there was no "consistent explanation to explain those injuries," and the social worker had received "an unbiased, specific report citing fear of child abuse"). Also, at least one state court has incorporated the theory into its substantive standard for determining whether children are "abused." *See In re Marino S.*, 795 N.E.2d 21, 28 (N.Y. 2003) (authorizing lower courts to make "derivative findings" of severe abuse under state law, "predicated upon the common understanding that a parent whose judgment and impulse control are so defective as to harm one child in his or her care is likely to harm others as well").

The "targeted child" theory has some intuitive appeal, but the parties have provided us with precious little information about it. According to the studies described by Dr. Campbell, "abuse or serious concerns of abuse exist in nearly half of the families in which another sibling has been previously abused." App.

- 19 -

245. Three factors, however, might undermine the relevance of those studies. First, we have no information about the *immediacy* of the threat identified by the theory. If it typically took several weeks for abuse to transfer from one child to another, for example, then the theory could not serve as the basis for reasonable suspicion of an "imminent peril of abuse" as to the second child. *Gomes*, 451 F.3d at 1129 (internal quotation marks omitted). In that case, due process would demand the usual predeprivation notice and a hearing. Second, we have limited information about the *relevance* of the theory. From Dr. Campbell's description, studies have found a correlation between a known history of abuse for one child and "abuse or serious concerns of abuse" in a sibling. App. 245. But correlation and causation are two different things. That parents who abuse one child are likely to also be abusing other children in the household does not necessarily mean that parents who have abused only one of their children will start to abuse the others when the first is removed. Third, we have no information about *exceptions* to the theory. It may be, for example, that the age of the children involved, birth order, prior medical history, gender, temperament, or other factors strongly influence the likelihood that abuse will transfer between siblings. In this case, for example, Ashley was the only child in the home for more than four years, before Jasmine was born. Yet Ms. Barrera-Garcia saw no signs of abuse during her discussions with Ashley, and CYFD uncovered no evidence that she

ever had been "targeted." App. 277. Depending on the details of the theory, these facts might be especially important (or utterly irrelevant).

We need not make any general pronouncements about the reliability of the "targeted child" theory, however, because in this case the Plaintiffs effectively have conceded the point. The Defendants submitted a half-dozen uncontested affidavits and deposition excerpts explaining that, based on their training and experience, state officials routinely remove all of the children from a home when they harbor reasonable suspicions of abuse of any one child. Further, the Defendants reached their "targeted child" decision only after careful consideration of the facts of this case. During their staff meeting, CYFD personnel noted that Jasmine was "the most needy, the most demanding" child in the home, and therefore agreed upon specific, articulable reasons that Ashley might become the next target. App. 310. The Plaintiffs, in response, have presented no evidence calling the "targeted child" theory into question, and have offered no reason to doubt the Defendants' application of that theory to Jasmine and Ashley. Based on the record before us, no genuine issue of material fact exists as to the whether the Defendants had "reasonable and articulable suspicion" that Ashley was in imminent peril of abuse.

### B. Clearly Established Federal Law

Because we have determined that the Defendants' actions did not violate any constitutional right, we need not decide whether they violated clearly

established law at the time they took place. *Roska*, 328 F.3d at 1239 ("Order is important; we must decide first whether the plaintiff has alleged a constitutional violation, and only then do we proceed to determine whether the law was clearly established.").

## III. Conclusion

We **AFFIRM** the decision of the district court granting summary judgment for the Defendants.