# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2499

_____

K.D., a Minor, Through his Mother,     *
Michelle Deason; Michelle Deason,     *
Individually,     *
    *
        Plaintiffs-Appellants,     *
    *    Appeal from the United States
        v.     *    District Court for the
    *    District of Minnesota.
County of Crow Wing; Andy Galles;     *
City of Brainerd; Michael Bestul,     *
    *
        Defendants-Appellees.     *

_____

Submitted: November 17, 2005
Filed: January 18, 2006

_____

Before WOLLMAN, LAY, and MELLOY, Circuit Judges.

_____

LAY, Circuit Judge.

K.D., a minor, and his mother Michelle Deason brought this 42 U.S.C. § 1983 claim against the County of Crow Wing, Deputy Andy Galles, the City of Brainerd, and Officer Michael Bestul for the temporary removal of K.D. from his mother's

custody.  K.D. and Deason appeal the district court's[1] decision to grant Defendants' motion for summary judgment on the basis of qualified immunity.  We affirm.

I.

In fall 2001, Deputy Andy Galles was working as a narcotics officer for Crow Wing County, Minnesota.  He and Special Agent Tom Wyatt from the Bureau of Criminal Apprehension went to the Morrison County Jail to meet with Rodney Simon, an inmate, because Simon had asked to speak to a narcotics investigator.  Simon told Deputy Galles that his sister, Michelle Deason, had been trafficking narcotics from the St. Cloud, Minnesota, area using Enterprise rental cars.  According to Deputy Galles, Simon gave a specific address where his sister was living, drew a map of her home and indicated where she transported drugs.  Simon stated that he wanted his sister out of the drug world and that he was concerned for Deason's seven-year-old son, K.D.

Upon investigation of Deason, Deputy Galles stated that his suspicions were heightened when he confirmed the information provided by Simon.  Deputy Galles testified that his training taught him that frequent car rental by people who already have a mode of transportation is common among individuals who are distributing or trafficking narcotics because changing cars allows them to camouflage their activities. As part of the investigation of Deason's suspected drug-related activity, every time Deason would return a rental car, Deputy Pat Pickar would walk around the returned vehicle with a certified narcotics canine.  Each time, the dog indicated that the vehicle contained the scent of narcotics.

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

On October 26, 2001, Deputy Pickar stopped Deason's Ford pickup truck for a suspended object hanging from the rear view mirror. Deason's sister-in-law, Kim Simon, was riding with her at the time of the stop. Deputy Pickar and his narcotics canine conducted a narcotics search around Deason's vehicle. The canine made a positive alert to the driver's side door. Deputy Pickar asked the women to step out of the vehicle so he could search it. Inside Kim Simon's purse, Deputy Pickar found two marijuana pipes, three containers containing marijuana residue, and one knife used to scrape marijuana. Deputy Pickar found another marijuana pipe in Deason's purse. Deputy Pickar also found one small baggie containing white residue in the vehicle and another baggie with white residue just outside the vehicle. Kim Simon was taken into custody because an active warrant existed in Wright County for her arrest. Deason was released with a citation for possession of drug paraphernalia and a written warning for the suspended object hanging from her mirror.

On November 14, 2001, a Minnesota state trooper stopped Deason for speeding while she was driving a rental vehicle. While the trooper conducted a driver's license and warrant check on Deason, Deputy Pickar and his canine conducted a search around the vehicle. The canine alerted to the passenger door and Pickar found a small amount of marijuana in a CD case on the passenger seat. The trooper issued a citation to Deason for possession of marijuana and Deputies Galles and Pickar had the vehicle transported to the Crow Wing County Law Enforcement Center for a more thorough search. The deputies also brought Deason in for questioning.

Deputy Galles and Officer Bestul of the Brainerd Police Department questioned Deason at the county law enforcement center. Deputy Galles explained the information they had about Deason trafficking narcotics from St. Cloud. Deason denied any involvement with narcotics trafficking and consented to a search of her home. The search did not reveal any drugs in Deason's home. When asked about her son's whereabouts, Deason told Deputy Galles that her son, K.D., was with her boyfriend, Gene Walters. Deason asserts that when she denied her involvement in

selling drugs, the officers threatened to have social services take K.D. from her. Deason was released with no further action that day.

On November 15, 2001, Deason took a taxi to the law enforcement center with K.D. and Gene Walters in order to retrieve her vehicle.[2] Deason asserts that she brought K.D. with her because she was afraid to allow him to attend school due to the threats made by Officer Bestul and Deputy Galles the previous day. Deason asserts that when she arrived at the law enforcement center, Officer Bestul grabbed her by the arm and said, "Come on. We're going over to social services. I told you we're not playing no fucking games." Deason and Officer Bestul met with Cindy Johnson, a social worker for Crow Wing County. Officer Bestul told Johnson that Deason was suspected of narcotic trafficking and that her son had been with her during trafficking situations.

Johnson asked Deason to submit to a urinalysis at the local hospital. K.D. remained at the county law enforcement center. Deason asserts that she was told that after the urinalysis her son would be returned to her. Deputy Galles, Officer Bestul, and Johnson all stated in their depositions that they believed Deason was under the influence of drugs because she was exhibiting signs of being on a controlled substance when she came to the law enforcement center that day. However, neither of the incident reports prepared by Deputy Galles or Johnson explicitly indicates that anyone believed Deason was under the influence of drugs at the time of K.D.'s removal.[3]

Johnson and Deputy Galles also interviewed K.D. Afterward, Johnson, Deputy Galles, and Officer Bestul met and Deputy Galles made the decision that it was in

---

[2]Gene Walters had a cancelled driver's license.

[3]Johnson's report did indicate that the living conditions with Deason were unsafe for K.D. "due to narcotic consumption and narcotic distribution out of the residence."

K.D.'s best interest to place the boy on a 72-hour protective hold. When Deason returned from the urinalysis at the hospital, she was told that K.D. would not be returned to her. Deason asserts that Officer Bestul said, "If you are not going to cooperate, we're keeping him." Deason requested that K.D. be placed with her mother, but her request was denied.

Deason immediately hired an attorney, who filed a petition for a writ of habeas corpus on November 16, 2001, in order to return K.D. to the custody of his mother. Deason asserts that she repeatedly attempted to contact Johnson during the time that K.D. was in protective custody, but that Johnson did not accept her calls. At approximately 5:00 p.m. on November 16, Deason was informed that she could pick up her son. On November 21, the results of Deason's urinalysis came back positive for substances found in marijuana and methamphetamine.

Deason, individually and on behalf of K.D., brought claims against Crow Wing County, Deputy Galles, the City of Brainerd, and Officer Bestul. K.D. and Deason both individually asserted: (1) two theories of liability under § 1983, alleging violations of the search and seizure clauses of the Fourth Amendment of the United States Constitution and violations of the Due Process Clause of the Fifth Amendment as incorporated by the Fourteenth Amendment of the United States Constitution; and (2) intentional infliction of emotional distress. K.D. also brought a claim for false imprisonment. In addition, K.D. and Deason jointly asserted causes of action for negligence against all Defendants and vicarious liability against Crow Wing County and the City of Brainerd. The district court granted Defendants' motions for summary judgment as to all claims. Plaintiffs now appeal the district court's decision to grant summary judgment for Defendants on the basis of qualified immunity.[4]

---

[4]Plaintiffs argue in their reply brief that they have not waived their appeal of the district court's summary judgment order regarding their other claims. However, Plaintiffs failed to raise the issue or make an argument in their opening brief referencing these claims. Therefore, Plaintiffs have waived the appeal of these claims.

## II.

We review de novo a district court's grant of summary judgment on the basis of qualified immunity. *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Qualified immunity shields government officials from liability in civil lawsuits when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We must first consider whether, construed in the light most favorable to the party asserting the injury, the facts alleged show the officers' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation could be established on the facts alleged, we must then consider whether, in the specific context of the case, the right was clearly established. *Id.* A right is clearly established when a reasonable official would understand that the actions at issue violate that constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In § 1983 actions involving interference with the right to familial integrity, "it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis." *Manzano v. South Dakota Dep't of Soc. Servs.*, 60 F.3d 505, 510 (8th Cir. 1995).

---

*Nebraska Plastics, Inc. v. Holland Colors Am., Inc.*, 408 F.3d 410, 421 n.5 (8th Cir. 2005); *Meyers v. Starke*, 420 F.3d 738, 742-43 (8th Cir. 2005) ("To be reviewable, an issue must be presented in the brief with some specificity. Failure to do so can result in waiver."). Even assuming these claims were not waived, Plaintiffs would still not prevail because we find that no constitutional violation occurred and the officers' actions were objectively reasonable.

Parents have a liberty interest "in the care, custody, and management of their children." *Id.* at 509. Parents and children have a constitutionally protected liberty interest in the care and companionship of each other.[5] *Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997). However, "'the liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" *Manzano,* 60 F.3d at 510 (quoting *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987)). In cases where the rights of the parent are balanced against the state's interest in protecting the child, the qualified immunity defense is difficult to overcome. *Id.*

The circumstances under which a child can be removed from his or her parents' custody without a court order are extremely limited. Deputy Galles removed K.D. from Deason's custody under Minnesota Statutes § 260C.175, which provides that a child may be taken into immediate custody by a peace officer "when a child is found in surroundings or conditions which endanger the child's health or welfare or which such peace officer reasonably believes will endanger the child's health or welfare." Minn. Stat. § 260C.175, subd. 1. In light of the facts discussed below, we conclude that Defendants did not violate Plaintiffs' constitutional rights when K.D. was temporarily removed from Deason's custody under this statute.[6]

---

[5]Both Deason's and K.D.'s claims are assessed under the same analysis. *See, e.g.*, *Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000).

[6]Once a child is removed from parental custody without a court order, the state bears the burden to initiate prompt judicial proceedings to provide a post deprivation hearing. *Whisman*, 119 F.3d at 1311. Minnesota law provides that a child taken under Minn. Stat. § 260C.175 must be provided a hearing within 72 hours of his or her removal to determine whether continued state custody is appropriate. Minn. Stat. § 260C.178, subd. 1. In this case, K.D. was returned to Deason before the need for such a hearing arose.

We have repeatedly held that when a state official takes an action that would otherwise disrupt familial integrity he or she is entitled to qualified immunity if the action is properly founded upon a reasonable suspicion of child abuse. *See, e.g.*, *Abdouch v. Burger*, 426 F.3d 982, 987 (8th Cir. 2005); *Whisman*, 119 F.3d at 1310; *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1371 (8th Cir. 1996); *Manzano*, 60 F.3d at 511. Plaintiffs seem to argue that this rule should be limited to instances of abuse or neglect investigations. However, the government's ability to immediately intervene in the interest of minor children cannot be so constrained. In cases in which continued parental custody poses an imminent threat to the child's health or welfare, emergency removal of children without a court order is constitutionally permitted. *See, e.g.*, *Thomason*, 85 F.3d at 1373 (discussing "the state's interests in immediately removing the child from a potentially life-threatening abusive home setting").

In light of the facts known to the officers at the time, it was reasonable for Officer Bestul and Deputy Galles to conclude that they were presented with a situation where a child's welfare was imminently threatened.[7] At the time K.D. was removed from her custody, Deason was under investigation for narcotics trafficking. This investigation was not premised solely on the allegations of Deason's brother. Rather, the officers' suspicions were confirmed through Deason's frequent car rentals and the narcotics canine alerting to every vehicle Deason returned to the rental car agency. Furthermore, when Deason arrived at the law enforcement center to pick up her vehicle, she was apparently under the influence of a stimulant. Deputy Galles, Officer

---

[7]Plaintiffs assert that Officer Bestul and Deputy Galles were not acting in the interest of protecting K.D.'s welfare, but rather were attempting to coerce Deason's cooperation with their narcotics investigation. This allegation, if true, would constitute a deplorable abuse of authority. However, the question facing us is not the officers' subjective intent, but rather whether a reasonable officer could believe the removal of K.D. to be lawful in light of the information they possessed. *See Harlow*, 457 U.S. at 817-19.

Bestul, and Johnson, all trained to recognize the symptoms of drug use, testified that Deason appeared to be exhibiting behavior that was consistent with the use of methamphetamine, amphetamine, or "some sort of upper." Deason's own deposition testimony supports these observations, as she stated that she took "No Doze" after being up all night the night before.

Plaintiffs assert that the district court failed to view the evidence in the light most favorable to their claims, and argue that there is a question of fact as to whether Deputy Galles, Officer Bestul, and Johnson believed that Deason was under the influence of an intoxicating substance on the day of K.D.'s removal. Plaintiffs argue that no one communicated this belief to Deason at the time and pointed out that the alleged observations do not appear in the police or social worker's written reports. In addition, Plaintiffs argue that the Defendants' failure to find any drugs during the search of her home contradicts their assertion that she was involved in narcotics trafficking in her residence.

Evaluating the evidence in the light most favorable to Plaintiffs, we cannot agree that a factual dispute exists. Deputy Galles, Officer Bestul, and Johnson all consistently and independently asserted that Deason was exhibiting behavior that was consistent with stimulant drug use. Deason's own statement that she had taken "No Doze" supports their observations of her behavior. Further, Deason was asked to take a urinalysis test, which gave her notice that the officers and social worker suspected she was using drugs. When Deason's urinalysis test results arrived a few days later, it was positive for substances found in methamphetamine, which gives added weight to the observations made by Deputy Galles, Officer Bestul, and Johnson. Regarding the narcotics investigation, as discussed above, Defendants had evidence to support their suspicions that Deason was involved with narcotics. The fact that no drugs were found during one search of her home does not detract from the reasonableness of their concerns for K.D.'s safety.

In this case, Deason's behavior at the law enforcement center and the ongoing narcotics trafficking investigation led to the reasonable conclusion that K.D.'s health or welfare was at risk. The larger question is whether the actions taken by Defendants and the resulting disruption to Deason and K.D.'s familial relations were disproportionate under the circumstances. *Abdouch*, 426 F.3d at 987; *Thomason*, 85 F.3d at 1371-72. Deason requested that K.D. be placed with her mother. Defendants testified they refused to do so because they believed it might result in K.D. returning directly to Deason's custody. K.D. was instead placed in a 72-hour protective hold in foster care. Johnson testified in her deposition that placing a child in foster care rather than with a relative is a standard practice in a 72-hour protective hold because that gives social services the time to investigate other placement options and prevents the child from being placed in the care of individuals who are unknown to social services. K.D. was released the next day, little more than 24 hours after he was removed from his mother's custody.

Law enforcement and social workers face difficult decisions in deciding whether the risks facing a child justify intruding into the highly protected rights of familial integrity. In this case, officers made the decision to temporarily remove K.D. from his mother's care due to the risk presented by Deason's apparent narcotic intoxication and their suspicions that Deason was involved in drug trafficking out of her home. Under the circumstances of this case, we cannot fault Defendants for deciding to place K.D. in temporary foster care rather than with his grandmother, a person unknown to social services. The relatively limited intrusion into the familial relationship was not so disproportionate to the potential risk to K.D.'s well-being as to rise to the level of a constitutional violation. *Cf. Whisman*, 119 F.3d at 1310 (denying qualified immunity when a child was held for seventeen days without an investigation or a hearing when "there was no indication of any physical neglect of [the child], no indication of any immediate threat to his welfare and no indication of any criminal activity by [the mother] or anyone else").

Because we have concluded that Defendants' actions were proportional given the district court's reasonable belief that K.D. faced the threat of immediate harm, we hold no constitutional violation took place and that, accordingly, the district court did not err in granting the Defendants' motion for summary judgment.

## III.

For the foregoing reasons, we affirm the decision of the district court.

_____