**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SHAUNA GOMES; DOMINGOS
GOMES; and REBEKAH GOMES,

Plaintiffs-Appellants,

v.

No. 04-4197

DEBORAH A. WOOD; MEGAN
ANNES; KERRI KETTERER; and
TESS BLACKMER,

Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH
(D.C. No. 2:01-CV-735-PGC)**

---

Steven C. Russell, Affordable Legal Advocates, P.C., Salt Lake City, Utah, for
Plaintiffs-Appellants.

J. Clifford Peterson, Office of the Attorney General (Brent A. Burnett, Peggy E.
Stone, and Peter L. Rognlie, Assistant Attorneys General, and Mark L. Shurtleff,
Attorney General, on the brief), Salt Lake City, Utah, for Defendants-Appellees.

---

Before **HENRY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

---

**HENRY,** Circuit Judge.

On April 30, 2000, Megan Annes, a child protection caseworker with the Utah Division of Child and Family Services, removed nine-month-old Rebekah Gomes from Rebekah's home and placed her in protective custody. Ms. Annes's decision was based on a four-inch linear skull fracture that Rebekah's treating physician had reported to Child and Family Services four days earlier. In September 2000, the Division of Child and Family Services found that protective custody was no longer warranted and returned Rebekah to her family.

Rebekah and her parents, Shauna and Domingo Gomes, then filed this 42 U.S.C. § 1983 action against Ms. Annes, Kerri Ketterer and Tess Blackmer (Ms. Annes's supervisors), and Assistant Attorney General Deborah Wood. The Gomeses alleged that the removal of Rebekah from their home without prior notice and a hearing violated their due process rights under the Fourteenth Amendment.

The district court granted summary judgment to all the defendants. Relying on Carey v. Piphus, 435 U.S. 247 (1978), the court reasoned that the state's affording the Gomeses a post-removal hearing on May 3, 2000 foreclosed their claims for damages for failing to provide a pre-removal hearing. The court also indicated that "it likely would have reached the same result" on alternative grounds—that emergency circumstances justified removal without a hearing and that the defendants were entitled to qualified immunity. Aplts' App. at 941 (Dist. Ct. Order, filed July 16, 2004).

We disagree with the district court's application of Carey to these facts, but we affirm its decision for a different reason: we hold that because Ms. Annes did not violate clearly established law of which a reasonable official would have known, she and the other defendants are entitled to qualified immunity.

## I.  BACKGROUND

### A.  The Removal of Rebekah

On April 26, 2000, Shauna Gomes took Rebekah to her pediatrician, Dr. Brent Knorr.  She told Dr. Knorr that Rebekah had injured her head on the previous day when she fell off the bed.  She reported that Rebekah had slept a lot since the fall and was "cranky" and "clingy."  Aplts' App. at 585.

Dr. Knorr examined Rebekah and found a large amount of swelling.  An x-ray revealed a four-inch parietal fracture on Rebekah's skull.  However, there was no depressed fracture—a significant finding because such fractures are more likely to injure the brain.  The fracture was linear, not star-shaped, which suggested to Dr. Knorr that it had been caused by a blunt trauma.

Dr. Knorr found Ms. Gomes's explanation of the injury "possible but suspicious."  Id. at 930.  He stated that the shape of Rebekah's fracture was "consistent with a fall on a flat object."  Id. at 929.  However, in deposition testimony, he explained that he had seen many children who had fallen from beds, or objects of similar heights, but had not suffered the kind of fracture that he had

3

seen on Rebekah. Dr. Knorr was also concerned that Ms. Gomes had waited until the day after Rebekah's injury to seek medical attention. To Dr. Knorr, the delay in seeking care was "one of the warning signs that maybe something--wasn't on par with what I was told." Id. at 596.

Dr. Knorr prescribed Motrin. He told Ms. Gomes that he was required to report the fracture (and Ms. Gomes's explanation of it) to the Division of Child and Family Services. Nevertheless, he sent Rebekah home and told Ms. Gomes that he was comfortable doing so.

Dr. Knorr then reported the incident to Child and Family Services by telephone. The intake caseworker responded that, because the matter did not appear to be an emergency, an investigator would call him back on the following day.

On April 27, 2000, Ms. Gomes returned to the doctor's office with Rebekah. She was concerned that Rebekah had been vomiting. Dr. Knorr was out of the office, but his partner examined Rebekah and concluded that the vomiting was caused by the stomach flu and not by the head injury.

On April 28, 2000, Ms. Gomes again returned to Dr. Knorr's office for a follow-up visit. She asked him if he had contacted Child and Family Services, noting that no one had contacted her. Evidently, no one had contacted Dr. Knorr either, as he responded that he would follow up with the agency. He concluded that Rebekah was doing well, and he again "felt comfortable leaving the child in

4

her mother's care."  Id. at 930-31.

On the same day, Dr. Knorr spoke by telephone with the defendant Megan Annes, a caseworker in the Division of Child and Family Services.  He told her that "the mother's explanation was possible but suspicious" but that he "felt comfortable leaving [Rebekah] in her mother's care."  Id. at 930.

After speaking with Dr. Knorr, Ms. Annes met with her supervisors, Tess Blackmer and Kerri Ketterer (who are also named as defendants in this case).  They advised Ms. Annes that it might be necessary to take Rebekah into protective custody immediately—without first conducting a hearing.  Ms. Blackmer indicated that "there were substantial reasons to believe that there was a substantial danger to Rebekah's physical health and safety."  Id. at 550.  Ms. Blackmer based that conclusion on the severity of Rebekah's skull fracture, Dr. Knorr's suspicions regarding Ms. Gomes's explanation of the fracture, the Gomeses' apparent delay in seeking medical treatment for the fracture, Rebekah's young age, and the possibility that further medical treatment for the skull fracture might be delayed.  Id.  Ms. Ketterer added that she did not find Ms. Gomes's explanation of Rebekah's injury to be credible.  See id. at 556 (stating that "[b]ased on my training and experience . . .  I did not believe it was possible for a nine-month-old child to receive a four-inch skull fracture from a two-foot fall off a bed because of the softness of a baby's skull bones").  Both supervisors advised Ms. Annes to investigate further and to seek legal advice.

Ms. Annes then telephoned the defendant Deborah Wood, an Assistant Attorney General for the State of Utah in the child services division (and the fourth defendant in this case). Ms. Wood also concluded that Rebekah's "physical health and safety were in substantial danger." Id. at 563. Ms. Wood and Ms. Annes agreed that Ms. Annes should conduct a home visit. Ms. Wood advised Ms. Annes that "if [Ms. Annes] concluded there was substantial cause to believe that placing Rebekah Gomes into protective custody was necessary to protect her from a substantial danger to her physical health and safety, the decision would comply with the applicable state statutes." Id. at 564. Ms. Wood added that she would support the removal by filing a petition in the juvenile court seeking an out-of-home placement. Id.

On the following day, April 29, 2000, Ms. Annes contacted a police detective and proceeded with him to the Gomeses' home. They arrived at 12:30 p.m. but discovered that no one was there.

On April 30, 2000, Ms. Annes and another police officer returned to the Gomeses' home and interviewed them there. Ms. Annes asked how Rebekah had been injured. After Ms. Gomes offered the same explanation that she had given to Dr. Knorr, Ms. Annes inspected the bed and the floor where Ms. Gomes maintained that Rebekah had fallen. Her inspection confirmed her view that Ms. Gomes's explanation was not plausible. Ms. Annes was also concerned because Ms. Gomes told her that she had not noticed the fracture until the day after the

6

fall. Accordingly, Ms. Annes decided to take Rebekah into protective custody and removed her from the Gomeses' home.

On May 3, 2000, Assistant Attorney General Wood filed a petition for custody in the Utah County Fourth District Juvenile Court. The petition recited the facts surrounding Rebekah's skull fracture, alleged that there was a substantial danger to Rebekah's health and safety, and requested the court to award custody to the Division of Child and Family Services for out-of-home care and placement. The court conducted a hearing on the same day. The Gomeses were represented by counsel, and they agreed that Rebekah could be placed in the temporary custody of the Division of Child and Family Services. Rebekah remained in state custody until September 2000, when the Division of Child and Family Services determined that the circumstances warranted returning her to her family.

**B. The Gomeses' Section 1983 Action**

In September 2001, the Gomeses filed this 42 U.S.C. § 1983 action against Ms. Annes, Ms. Ketterer, Ms. Blackmer, and Ms. Wood. They asserted that taking Rebekah into state custody without prior notice and a hearing violated their due process rights under the Fourteenth Amendment, and they sought actual damages for this alleged constitutional violation.

The Gomeses and the defendant state officials each moved for summary judgment, and the district court granted summary judgment to all the defendants.

The court reasoned that the state court's finding after a post-removal hearing that Rebekah should remain in state custody foreclosed the Gomeses' claim for damages arising out of failure to provide a pre-removal rehearing. According to the district court, "[t]he Supreme Court had made clear that where an adverse action would have nevertheless been taken had the plaintiff received adequate due process, the plaintiff would not be entitled to recover damages to compensate her for the adverse action." Aplts' App. at 939 (discussing Carey v. Piphus, 435 U.S. 247 (1978)). "In such circumstances, 'the failure to accord procedural due process could not properly be viewed as the cause of the [adverse action]' and to 'award damages for injuries caused by [such action] would constitute a windfall, rather than compensation.'" Id. at 939-40 (quoting Carey, 435 U.S. at 260).

The district court also concluded that it would likely reach the same result on two alternative grounds. First, the court stated, there were emergency circumstances posing an immediate threat to Rebekah's safety. As a result, the Due Process Clause of the Fourteenth Amendment did not require a pre-removal hearing. Id. at 941 & n.6 (citing Roska v. Peterson, 328 F.3d 1230, 1245 (10th Cir. 2003)).[1] Second, the court suggested that the defendants might be entitled to qualified immunity because they had relied on (a) a state statute, Utah Code Ann.

---

[1] This court has issued three opinions in the cited case: Roska v. Peterson, 437 F.3d 964 (10th Cir. 2006) (Roska III); Roska v. Peterson, 328 F.3d 1230 (10th Cir. 2003) (Roska II); and Roska v. Peterson, 304 F.3d 982 (10th Cir. 2002) (Roska I).

8

§ 64A-4a-202.1 (1998), that authorized removal without a hearing if there was a substantial danger to the physical health or safety of the child; and (b) the advice of Assistant Attorney General Wood.

## II. DISCUSSION

On appeal, the Gomeses first argue that the district court erred in ruling that their claims were foreclosed by the state-court findings at the May 3, 2000 hearing that the removal of Rebekah was justified. They then contend that they were entitled to notice and a hearing before Rebekah was removed from their home on April 30, 2000, and that they should be allowed to recover damages for this violation of their due process rights.

In response, Ms. Annes, Ms. Ketterer, Ms. Blackmer, and Ms. Wood defend the district court's reliance on the state court's findings. They also argue that the district court's grant of summary judgment may be affirmed on the alternative ground that they are entitled to qualified immunity.

We review the district court's grant of summary judgment de novo, applying the same legal standards as employed by the district court. B-S Steel Of Kan., Inc. v. Tex. Indus., 439 F.3d 653, 660 (10th Cir. 2006). We review the record in the light most favorable to the party opposing summary judgment. Id. When, as here, there are no genuine issues of material fact in dispute, we review the case to determine if the district court correctly applied the substantive law. Gamble,

9

Simmons & Co. v. Kerr-McGee Corp., 175 F.3d 762, 766 (10th Cir. 1999).

We begin by reviewing the requirements of the Due Process Clause when the state seeks to remove children from the home. Then, we proceed to the parties' arguments regarding the significance of the post-removal hearing and the defense of qualified immunity.

## A.  Removing Children from the Home in Emergency Circumstances

Under the Fourteenth Amendment to the United States Constitution, parents have a protected liberty interest in the care, custody and control of their children. Troxel v. Granville, 530 U.S. 57, 65 (2000). That interest is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." Id. (citing Pierce v. Soc. of Sisters, 268 U.S. 510, 534-35 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923)); see also Wisconsin v. Yoder, 406 U.S. 205, 232, (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). As a result, state officials may not remove children from the home, through either temporary seizures or the permanent termination of parental rights, without providing due process of law. Santosky v. Kramer, 455 U.S. 745, 753-54 (1982); Roska II, 328 F.3d at 1245.

Nevertheless, the parents' liberty interest is not absolute. States have a

10

*parens patriae* interest in preserving and promoting children's welfare, Santosky, 455 U.S. at 766, including "a 'traditional and transcendent' interest" in protecting children from abuse, J.B. v. Washington County, 127 F.3d 919, 927 (10th Cir. 1997) (quoting Maryland v. Craig, 497 U.S. 836, 855 (1990)).

As a result, when a state agency seeks to remove children from the home, due process requires that the parents receive prior notice and a hearing, except in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989) (quoting Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 848 (1977)). These "extraordinary situations" include "[e]mergency circumstances which pose an immediate threat to the safety of a child." Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997). However, "the 'mere possibility' of danger is not enough to justify a removal without appropriate process." Roska II, 328 F.3d at 1245 (quoting Tenenbaum v. Williams, 193 F.3d 581, 594 (2d Cir. 1999)).

Importantly, even when such a pre-hearing removal is justified, the state must act promptly to provide a post-removal hearing. See K.D. v. County of Crow Wing, 434 F.3d 1051, 1056 n.6 (8th Cir. 2006) ("Once a child is removed from parental custody without a court order, the state bears the burden to initiate prompt judicial proceedings to provide a post deprivation hearing."); Brokaw v. Mercer County, 235 F.3d 1000, 1020 (7th Cir. 2000) ("[D]ue process guarantees that the

11

post-deprivation judicial review of a child's removal be prompt and fair."); Campbell v. Burt, 141 F.3d 927, 929 (9th Cir. 1998) (stating that "[f]ederal procedural due process guarantees prompt post-deprivation judicial review in child custody cases"); Weller v. Dep't of Soc. Servs. for Baltimore, 901 F.2d 387, 396 (4th Cir. 1990) ("[E]ven if it is constitutionally permissible to temporarily deprive a parent of the custody of a child in an emergency, the state has the burden to initiate prompt judicial proceedings to ratify its emergency action.").

Our cases have not offered a precise definition of "emergency circumstances which pose an immediate threat to the safety of a child." Hollingsworth, 110 F.3d at 739. However, in several instances we have concluded that the requisite emergency circumstances did not exist. Most recently, in Roska II, 328 F.3d at 1240, 1245-46, we held that the parents of a twelve-year-old boy who had been removed from their home without prior notice or a hearing had sufficiently alleged a violation of their due process rights. Despite evidence indicating that a mother might be suffering from Munchausen Syndrome by Proxy ("a disorder where an individual, usually a mother, inflicts physical harm upon a child to gain the sympathy and attention of medical personnel," id. at 1238), "[t]here was nothing particularly unusual about [the boy's] condition at the time he was removed," id. at 1241. Moreover, the boy's physician had stated that it would be a mistake to remove him from the home. We also observed that state officials had not even attempted to obtain an ex parte order authorizing the removal. Accordingly, "no

12

evidence indicate[d] that [the boy] was in immediate threat of death or severe physical harm." Id.; see also Malik v. Arapaho County Dep't of Social Servs., 191 F.3d 1306, 1315 (10th Cir. 1999) (finding no "extraordinary circumstance dangerous to the child" based on the uncle of a four-year-old girl having taken nude photographs of her during a visit five months before the removal); Hollingsworth, 110 F.3d at 739 (concluding that "the record contains no evidence that [the plaintiff] actually endangered the welfare of her children prior to their removal").[2]

Other courts have provided a somewhat more precise formulation of the standard required under the Due Process Clause to remove a child from the home without prior notice and a hearing. The First Circuit has concluded that a majority of circuits addressing this issue have held that "a case worker . . . may place a child in temporary custody when he has evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse." Hatch v. Dep't for Children, Youth, & Their Families, 274 F.3d 12, 20

_____

[2] At the time of Rebekah's removal, Utah law also addressed the state's responsibility to place children in protective custody. See Roska III, 437 F.3d at 971-72 (10th Cir. 2006) (discussing the Utah statutory scheme, particularly, Utah Code Ann. § 62A-4a-202.1, 202.2 (1998) and Utah Code Ann. § 78-3a-301 (1998)). As we note below, there are instances in which state officials' reliance on a state statute may constitute an extraordinary circumstance warranting qualified immunity even when the officials have violated clearly established federal law. Roska II, 328 F.3d at 1251. However, because we conclude that the defendants here did not violate clearly established federal law, we need not apply the Utah statutory scheme to resolve this case.

13

(1st Cir. 2001) (citing Brokaw v. Mercer County, 235 F.3d 1000, 1019 (7th Cir. 2000)); Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1126 (3d Cir. 1997); Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996); and Manzano, v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 511 (8th Cir. 1995)); see also Hatch, 274 F.3d at 21-22 (adopting the reasonable suspicion standard);  Thomason v. SCAN Volunteer Servs., Inc., 85 F.3d 1365, 1373 (8th Cir. 1996) (explaining the justification for the reasonable suspicion standard by stating that "[w]here a treating physician has clearly expressed his or her reasonable suspicion that life-threatening abuse is occurring in the home, the interest of the child (as shared by the state as *parens patriae*) in being removed from that home setting to a safe and neutral environment outweighs the parents' private interest in familial integrity as a matter of law").

The Ninth and Eleventh Circuits have formulated the standard somewhat differently, requiring reasonable or probable cause of imminent danger.  See Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000) (stating that "[o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury") (emphasis added); Doe v. Kearney, 329 F.3d 1286, 1295 (11th Cir. 2003) (indicating that "a state may not remove a child from

14

parental custody without judicial authorization unless there is <u>probable cause to believe the child is threatened with imminent harm</u>") (emphasis added).

Notably, the Eleventh Circuit has indicated that this circuit has adopted the probable cause standard. <u>See</u> <u>Kearney</u>, 329 F.3d at 1295 (citing <u>Roska I</u>, 304 F.3d at 993). We do not read our <u>Roska</u> opinions in that way. In those opinions, we stated that "the mere possibility of danger" does not justify a warrantless removal. <u>Roska II</u>, 328 F.3d at 1245; <u>Roska I</u>, 304 F.3d at 993 (internal quotation marks omitted). However, we added that "emergency circumstances which pose an immediate threat to the safety of a child" may do so. <u>Roska II</u>, 328 F.3d at 1245 (quoting <u>Hollingsworth</u>, 110 F.3d at 739); <u>Roska I</u>, 304 F.3d at 993 (quoting <u>Hollingsworth</u>, 110 F.3d at 739). We did not specify whether the state must have a reasonable suspicion of such circumstances or must establish probable cause that they exist.

In determining whether emergency circumstances exist, there is also some disagreement as to the significance of another matter—whether state officials lacked sufficient time to obtain judicial authorization for the removal without jeopardizing the safety of the child. The Second Circuit has reasoned that:

> While there is a sufficient emergency to warrant officials' taking a child into custody without a prior hearing if he or she is immediately threatened with harm, the converse is also true. <u>If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's</u>

15

> removal, then the circumstances are not emergent; there is <u>no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child.</u> If, irrespective of whether there is time to obtain a court order, all interventions are effected on an emergency basis without judicial process, pre-seizure procedural due process for the parents and their child evaporates.

<u>Tennenbaum</u>, 193 F.3d at 594 (emphasis supplied) (internal citations and quotations omitted).

The Eleventh Circuit has criticized the Second Circuit's "sole focus [on] whether there is time to obtain a court order." <u>Kearney</u>, 329 F.3d at 1297. In the Eleventh Circuit's view, "due process is a flexible concept—particularly where the well-being of children is concerned—and deciding what process is due in any given case requires a careful balancing of the interests at stake, including the interests of parents, children, and the state." <u>Id.</u> "This kind of subtle balancing," the court reasoned, "cannot be properly accomplished when courts blunt the inquiry by simply asking whether there was time to get a warrant." <u>Id.</u> at 1297-98.

In our view, the reasonable suspicion standard appropriately balances the interests of the parents, the child, and the state. The failure to act when a child is in danger may have "unthinkable consequence[s]." <u>Jordan v. Jackson</u>, 15 F.3d 333, 350 (4th Cir. 1994). As a result, social workers should be afforded some discretion when they seek to protect a child whose safety may be at risk. <u>See</u> <u>Hatch</u>, 274 F.3d at 22; <u>Thomason</u>, 85 F.3d at 1373. Following the majority

16

approach, we conclude that state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there.

We emphasize again that even in these instances in which emergency removal is justified, the state must afford the parents a prompt post-removal hearing. See County of Crow Wing, 434 F.3d at 1056 n.6; Brokaw, 235 F.3d at 1020; Campbell, 141 F.3d at 929; Weller, 901 F.2d at 396.

As to whether state officials have time to seek judicial authorization for the removal, we agree with the Eleventh Circuit that this consideration should not be "the single focus" of the inquiry. Kearney, 329 F.3d at 1295. In many instances, it may not be entirely clear either how long it would take to obtain judicial approval or whether this period of delay would jeopardize the safety of the child. Nevertheless, we also agree with the Second Circuit's observation that, if we do not give any consideration to whether state officials might obtain judicial authorization of the removal without additional risk to the child, then the definition of an emergency may be broadened to such an extent that due process rights are eroded. Tennenbaum, 193 F.3d at 584.

Accordingly, we conclude that in determining whether state officials have a reasonable suspicion of an immediate threat to the safety of the child, we must consider "all relevant circumstances, including the state's reasonableness in

17

responding to a perceived danger, as well as the objective nature, likelihood, and immediacy of danger to the child." Kearney, 329 F.3d at 1295 (emphasis added). Ordinarily, the question of whether state officials had time to seek and obtain judicial authorization for the removal without jeopardizing the safety of the child will be an important consideration, and the failure to establish that judicial authorization was impracticable will undermine the contention that emergency circumstances existed. However, neither this factor, nor any other single factor, is necessarily dispositive.

We now turn to the particular arguments raised by the parties in this appeal.

## B. The Effect of the Post-Removal Hearing on the Gomeses' Claim for Damages

As we have noted, the district court concluded that it was not required to fully decide the issue of whether emergency circumstances existed to justify Rebekah's removal. Aplts' App. at 942. The court did state that it believed "that the defendants have adequately established that Rebekah faced an immediate threat, especially in light of the state court's conclusion that she did." Id. at 941-42.[3] However, the court concluded that the defendants were entitled to summary

---

[3]   In the state court proceedings, the Gomeses stipulated that Rebekah could remain in temporary custody of the Division of Child and Family Services. The state court concluded that "[a]n emergency situation existed" and that "[t]he removal of the child was appropriate and necessary." Aplts' App. at 578.

18

judgment on an alternative ground.

In particular, the court observed that the state had provided an adequate post-removal hearing and that the Gomeses did not challenge the state judge's decision that Rebekah remain in state custody. As a result, it concluded, the Gomeses could not prevail on their due process challenge to the pre-hearing removal. We agree with the Gomeses that the district court erred in relying on Carey v. Piphus, 435 U.S. 247 (1978), for this conclusion.

In Carey, the Supreme Court held that when a procedural due process violation occurs and adverse action results, damages for injuries caused by the adverse action may not be recovered if the defendant can prove the action would have been taken even absent the violation. See id. at 260 (stating that "in such a case, the failure to accord procedural due process could not properly be viewed as the cause of the [adverse action]"). Significantly, however, the Court also concluded that a plaintiff may recover nominal damages and actual damages arising not from the deprivation of liberty or property but from the denial of procedural due process itself. As to the latter category of damages, the Court emphasized that the plaintiff is still required to prove causation:

> In sum, then, although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983, we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused.

19

Id. at 264; see also McClure v. Ind. Sch. Dist. No. 16, 228 F.3d 1205, 1214 (10th Cir. 2000) (stating that "[i]n a proper case, however, a plaintiff may recover such damages by 'producing evidence that mental and emotional distress actually was caused by the denial of procedural due process itself'" (quoting Carey, 435 U.S. at 263)).

Here, the Gomeses have not contested the state judge's finding that the removal of Rebekah was justified.[4] Moreover, they have not sought nominal

---

[4] At oral argument, counsel for the defendant officials also suggested that the state court's findings at the post-removal hearing might bar the Gomeses' allegation in this § 1983 action that emergency circumstances justifying the removal did not exist. Counsel referred to the fact that the Gomeses had stipulated "that the prehearing requirements had been met and that [Rebekah] could remain in the temporary custody of [the Division of Child and Family Services]." Aplts' App. at 577. Moreover, counsel added, the state court's order also stated that "[a]n emergency situation existed" and that "the removal [of Rebekah] was appropriate and necessary" under the applicable Utah statute. Id. at 578.

Counsel for the Gomeses countered that, in light of the abbreviated nature of the post-removal hearing and the lack of opportunity for discovery, the state court's findings should not be determinative in the instant action.

This argument involves principles of issue preclusion under Utah law. See Career Serv. Review Bd. v. Utah Dep't of Corr., 942 P.2d 933, 938 (Utah 1997) (stating that "[f]our elements of issue preclusion are required for collateral estoppel: (1) The issue decided in the prior adjudication must be identical to the one presented in the action in question; (2) there must be a final judgment on the merits; (3) the party against whom the plea is asserted must be a party in privity with a party to the prior adjudication; and (4) the issue in the first action must be completely, fully, and fairly litigated"). The application of those principles to the state court's post-removal order appears to present some fairly close and difficult questions.

In any event, in neither the federal district court proceedings nor in this appeal did the defendants argue in their briefs that the state court order should be afforded preclusive effect in this action. We therefore decline to address the

20

damages. Accordingly, they may only recover damages arising from the denial of due process itself. On this issue, the district court stated that "the only damage [the Gomeses] claim to have suffered is the emotional damage that resulted from [Rebekah's] removal." Aplts' App. at 940.

In our view, the district court read the Gomeses' allegations too narrowly. We acknowledge that the line drawn by the Supreme Court in Carey–between (a) damages arising from the deprivation of liberty or property and (b) damages arising from the denial of procedural due process itself–may be a fine one. Moreover, in many instances, plaintiffs may offer the same evidence to support both classes of damages claims.

Nevertheless, the Gomeses have alleged that they have suffered damages from the denial of procedural due process itself (and thus recoverable under Carey). In particular, Rebekah Gomes's mother, Shauna Gomes, answered a deposition question about the damages that she had suffered as follows:

> Q: Could you describe those [damages] for me, please. I understand you've talked about pain and anguish earlier, so is there anything in addition . . . that you've suffered?

argument here. See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995) (holding that parties cannot raise arguments for the first time at oral argument).

Moreover, in light of our conclusion below that the defendant officials are entitled to qualified immunity, resolution of this issue is not necessary to the disposition of this appeal.

A: Yes. It's–I compare it to being attacked by a terrorist. I mean they come in and take something that is of most value to you, and I was able to get that thing back.

However, it's always there. . . . I wonder when they're going to strike again. I wonder what could happen. I have no control over it, they could come at any time. It doesn't depend upon my actions.

I've had dreams . . . from the trauma I went through, . . . when my child gets hurt with an accident or something, it just makes me sick to my stomach to have to take him in to the doctor. Who knows what might happen?

Aplts' App. at 783-84.

Viewing the record in the light most favorable to the Gomeses, this testimony concerns, in part, the manner in which Rebekah was removed (i.e., without prior notice and a hearing), and not merely the fact that she was removed. Ms. Gomes's statement that "they could come at any time" and her analogy to "being attacked by a terrorist" concern damages for the violation of procedural due process itself; her testimony addresses both the lack of notice and the randomness with which the Gomeses experienced the removal.

Accordingly, we conclude that the district court erred in ruling that the post-removal hearing and the findings by the state-court judge precluded the Gomeses from seeking damages for their due process claim.[5]

---

[5]    We emphasize that our application of Carey is based upon the damages alleged by the Gomeses. That is because both the defendants and the district

22

## C. Qualified Immunity

In light of its conclusion that <u>Carey</u> forecloses the Gomeses' claims for damages, the district court did not definitively resolve the merits of their due process claim. See <u>id.</u> at 942 (stating that "the court need not fully decide this issue"). However, in the district court proceedings and in this appeal, the defendant state officials have argued that they are entitled to summary judgment on the grounds of qualified immunity. They focus on the removal decision made by Ms. Annes, but they argue that because Ms. Annes is entitled to qualified

_____

court have incorrectly stated that the only damages the Gomeses have claimed are those resulting from the removal of Rebekah. See Aplts' App. at 519 (Mem. in Support of Defendant's Motion for Summary Judgment) (stating that "[i]t is undisputed that plaintiffs' alleged damages are emotional damages allegedly resulting from their not having their daughter with them" and that "[p]laintiffs have alleged no damages as a result of the alleged denial of procedural due process"); id. at 940 (Order Granting Defendants' Motion for Summary Judgment) (stating that "the only damage [the Gomeses] claim to have suffered is the emotional damage that resulted from [Rebekah's] removal"). As the deposition testimony quoted above clearly shows, the Gomeses' claim for damages should be read more broadly.

Whether this deposition testimony, combined with other evidence that the Gomeses might have offered, would be sufficient to support an award of compensatory damages is a question that we need not address here. Because the Gomeses have claimed damages for the violation of procedural due process itself, we proceed to the issue of qualified immunity and resolve the case on that basis. However, we note that, as a general rule, "a plaintiff's testimony, standing alone, may support a claim of emotional distress precipitated by a constitutional violation," but that "the case law [also] reveals that courts scrupulously analyze an award of compensatory damages for a claim of emotional distress predicated exclusively on the plaintiff's testimony." Price v. City of Charlotte, 93 F.3d 1241, 1251 (4th Cir. 1996).

23

immunity, the other defendants (who advised her regarding the removal decision) are also entitled to the same immunity. Upon de novo review of this legal question, see Maldonado v. City of Altus, 433 F.3d 1294, 1315 (10th Cir. 2006), we agree. See id. at 1302-03 (stating that "we have discretion to affirm on any ground adequately supported by the record so long as the parties have had a fair opportunity to address that ground") (internal quotation marks and citation omitted).

### 1. General Principles

Qualified immunity generally shields from liability for civil damages "government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Supreme Court has identified three purposes underlying this grant of immunity. First, qualified immunity "protect[s] the public from unwarranted timidity on the part of public officials." Richardson v. McKnight, 521 U.S. 399, 408 (1997). Second, the doctrine helps "to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." Id. (internal quotation marks omitted). Third, qualified immunity reduces the chance that lawsuits will distract from the performance of public duties. The doctrine seeks to balance the protection of constitutional rights and

24

the "substantial social costs" of imposing liability on public officials. Anderson v. Creighton, 483 U.S. 635, 638 (1987).

In analyzing the qualified immunity defense, this court has adopted a three-part inquiry. First, we ask whether the plaintiffs' allegations, if true, establish a constitutional violation. Lawrence v. Reed, 406 F.3d 1224, 1230 (10th Cir. 2005). If the allegations do not meet that standard, we must dismiss the claim.

Second, if the plaintiffs have alleged a constitutional violation, we examine "whether the law was clearly established at the time the alleged violations occurred." Roska II, 328 F.3d at 1247. The law is clearly established if a reasonable official in the defendant's circumstances would understand that her conduct violated the plaintiff's constitutional right. Moore v. Guthrie, 438 F.3d 1036, 1042 (10th Cir. 2006). Recently, the Supreme Court has "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004) (discussing Hope v. Pelzer, 536 U.S. 730 (2002)). Thus, government officials must make "reasonable applications of the prevailing law to their own circumstances," Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001) (internal quotation marks omitted), and they "can still be on notice that their conduct violates established law even in novel factual

25

circumstances." Hope, 536 U.S. at 741. However, the defendant official may demonstrate that she "neither knew nor should have known of the relevant legal standard" because the law was not clearly established at the time she acted. Harlow, 457 U.S. at 819. If the law is not clearly established, we "do not require officials to anticipate its future developments." Lawrence, 406 F.3d at 1230.

Finally, if the law was clearly established, we proceed to the third part of the inquiry. We ask whether, in spite of the fact that the law was clearly established, "extraordinary circumstances"—such as reliance on the advice of counsel or on a statute—"so prevented [the official] from knowing that [her] actions were unconstitutional that [she] should not be imputed with knowledge of a clearly established right." Roska II, 328 F.3d at 1251 (internal quotation marks omitted). "[W]here the right is clearly established, a defendant should only rarely be able to succeed with a qualified immunity defense." Id. (internal quotation marks omitted).

2. Application

a. existence of a constitutional violation

We begin with the threshold inquiry of whether the Gomeses' allegations, if true, state a constitutional violation. Under the due process principles we have outlined, we must determine whether Ms Annes had a reasonable suspicion of "emergency circumstances which pose an immediate threat to the safety of a

26

child," Hollingsworth, 110 F.3d at 739, when she removed Rebekah from the home. Because the defendant state officials raised the qualified immunity defense in their motion for summary judgment, we must view the evidence in the light most favorable to the Gomeses. Saucier v. Katz, 533 U.S. 194, 201 (2001) (noting that, under the first part of the qualified immunity inquiry, the question is whether "a violation could be made out on a favorable view of the parties' submissions"); Simkins v. Bruce, 406 F.3d 1239, 1241 (10th Cir. 2005) (stating that "[t]he threshold inquiry is whether the alleged facts (or, on summary judgment, the evidenced facts) taken in the light most favorable to the plaintiff show a constitutional violation").

Viewing the evidence in the light most favorable to them, genuine issues of material fact exist as to whether the defendants had reasonable suspicion to remove Rebekah before holding a hearing. First, although it was Rebekah's pediatrician, Dr. Knorr, who reported her injury to the Division of Child and Family Services, his testimony may be plausibly read to conclude that there was not an immediate threat to Rebekah's safety. In particular, Dr. Knorr stated that the shape of Rebekah's fracture was "consistent with a fall on a flat object," Aplts' App. at 929, and thus supported the Gomeses' statements that she had fallen onto the floor from a bed. Moreover, in his initial telephone call to the Division of Child and Family Services on April 26, 2000, and again in his second

27

call to the agency on April 28, 2000, Dr. Knorr reported that he was "comfortable" allowing Ms. Gomes to take Rebekah home. Id. at 930-31. Dr. Knorr added that "I never was highly suspicious that Rebekah had been the victim of child abuse, and I never told anyone at DCFS, or anyone else, that I was highly suspicious that the child had been abused." Id. at 931. That testimony is supported by the statement of the intake worker who answered Dr. Knorr's initial call and who told him that the circumstances did not sound like an emergency.

The Gomeses' own conduct also offers some support for their allegations. Ms. Gomes took Rebekah to the doctor on three successive days, and she now contends that these visits demonstrate that she was quite concerned about Rebekah's welfare. That behavior is at least arguably inconsistent with that of a neglectful or abusive parent. Moreover, during the appointment with Dr. Knorr on April 28, 2000, it was Ms. Gomes herself who informed him that she had not yet been contacted by the Division of Child and Family Services, thus leading him to call the agency a second time.

Thus, viewed in the light most favorable to the Gomeses, the record supports their contention that the defendant officials removed Rebekah without "reasonable and articulable suspicion that the child ha[d] been abused or [was] in imminent peril of abuse." Hatch, 279 F.3d at 20. We therefore proceed to the second part of the qualified immunity inquiry.

28

### b. whether the defendants violated clearly established law

We consider whether a reasonable official in the defendants' circumstances would understand that his or her conduct violated the Gomeses' due process rights. Moore, 438 F.3d at 1042. "[T]he salient question . . . is whether the state of the law [at the time of the incident] gave the [defendants] fair warning that their conduct was unconstitutional." Hope, 536 U.S. at 741. Officials who are mistaken about the lawfulness of their conduct may still be entitled to qualified immunity if the mistake is reasonable in light of the applicable law and the facts known to them at the time. Axson-Flynn v. Johnson, 356 F.3d 1277, 1300 (10th Cir. 2004).

We emphasize that when, as here, there is no dispute as to the material facts, the question is a legal one for the court to decide. As the Eighth Circuit has explained:

> [O]nce the predicate facts have been established, for the purposes of qualified immunity there is no such thing as a "genuine issue of fact" as to whether the officer "should have known" that his conduct violated constitutional rights. The conduct was either "reasonabl[e] under settled law in the circumstances," or it was not . . . .

Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991) (second brackets in original)); see also Cortez v. McCauley, 438 F.3d 980, 990-91 (10th Cir. 2006) (noting that when the

29

parties agree on the "'what-happened' questions," the question of whether "a[] [reasonable] officer 'should have known' that his conduct violated constitutional rights" is one of law).

Moreover, "if officers of reasonable competence could disagree" about the lawfulness of the challenged conduct, then "[qualified] immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986). In those instances, the fact that the uncontroverted evidence supports opposite legal conclusions as to the reasonableness of an official's conduct demonstrates that the official has not violated clearly established law. See id.; see also Anderson, 483 U.S. at 641 (stating that "[t]he relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the official's conduct] to be lawful, in light of clearly established law and the information the . . . officers possessed") (emphasis added); Cortez, 438 F.3d at 990-91 (same); Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988) (same).

Here, in light of those principles, we must determine whether a reasonable official, presented with the relevant information regarding Rebekah's skull fracture in April 2000, would have understood that there were no "[e]mergency circumstances which pose an immediate threat to [her] safety," Hollingsworth, 110 F.3d at 739, and that, as a result, removing her from home without prior

30

notice and a hearing violated the Gomeses' due process rights. Resolution of that question requires consideration of the case law in existence at that time.

As of April 2000, we had announced the emergency circumstances exception to the notice and hearing requirement, see Hollingsworth, 110 F.3d at 739, and we had had two occasions to apply that standard: in Hollingsworth itself and in Malik, 191 F.3d at 1315. However, in neither case was their any evidence whatsoever of an immediate threat. See Malik, 191 F.3d at 1315 (explaining that "[o]fficials' desire to circumvent an attorney's attempt to negotiate protective conditions for an interview does not rise to the level of an extraordinary circumstance dangerous to the child"); Hollingsworth, 110 F.3d at 739 (stating that "the record contains no evidence that [the plaintiff] actually endangered the welfare of her children prior to their removal"). Moreover, as of April 2000, we had not yet identified as an important consideration the time available to state officials to seek and obtain judicial authorization for the removal without jeopardizing the safety of the child. Nor had we held that the reasonable suspicion standard applies to the determination of whether emergency circumstances exist. Additionally, we had stated that "considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse." Washington County, 127 F.3d at 925 (quotation marks omitted).

In applying that case law to the circumstances confronted by the defendants, we conclude that "officers of reasonable competence could disagree" as to whether there were emergency circumstances justifying the removal of Rebekah without a hearing. Malley, 475 U.S. at 341. In conducting the first step in the qualified immunity analysis (whether the Gomeses have alleged the violation of a constitutional right), we have set forth the evidence that supports their contention that emergency circumstances did not exist. However, other evidence supports the opposite conclusion.

In particular, Dr. Knorr informed Ms. Annes that Ms. Gomes's explanation of Rebekah's injury was "possible, but suspicious." Aplts' App. at 797. He added that he had seen many children who had fallen from beds or objects of similar heights but who had not suffered such a fracture. Dr. Knorr's suspicion was supported by Ms. Annes's inspection of the bed at the Gomeses' residence. Based on her inspection, she too thought it unlikely that Rebekah could have sustained her head injury from the reported fall. Dr. Knorr also expressed concern about the Gomeses' delay in seeking medical treatment. He explained that Rebekah's skull would have shown swelling and bruising within hours of the reported fall from the bed but that Ms. Gomes did not seek treatment until the following day. Confronted with evidence of a significant head injury to an infant, a questionable explanation from the parents, and a delay in seeking medical treatment, a reasonable official could have believed that there was an immediate

32

threat to Rebekah's safety.

That conclusion is supported by many reported decisions granting qualified immunity to state officials responsible for removing children from the home. See, e.g, Berman v. Young, 291 F.3d 976, 983-84 (7th Cir. 2002) (concluding that defendant state officials were entitled to qualified immunity when they removed a child from a home because they had a reasonable basis for believing that the child was being abused); Hatch, 274 F.3d at 25 (holding that, when (a) a nine-year-old boy asserted that he had been abused, (b) two school officials took the boy's claim seriously, and (c) a neutral physician reported that the boy's injuries were consistent with the claim of abuse, the defendant state official was entitled to qualified immunity because the official "had a reasonable basis both for suspecting child abuse and for believing [a child] to be in danger," and noting that "[t]he fact that this suspicion proved, in the long run, to be unfounded does not strip [the defendant] of his entitlement to qualified immunity"); Foy v. Holston, 94 F.3d 1528, 1536-37 (11th Cir. 1996) (holding that the defendant officials were entitled to qualified immunity when they placed a child in foster care because the child had alleged abuse by her parents, had bruises on her arm, stated that she did not wish to return to her parents, and threatened suicide and adding that immunity was not lost "even if the investigation and custody determination procedures were not textbook perfect") (internal quotation marks omitted); Van Emrik v. Chemung County Dept. of Social Services, 911 F.2d 863, 866 (2d Cir. 1990) (observing that

33

"protective services caseworkers [must] choose between difficult alternatives" and that "[i]t is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it").

Although there are instances in which qualified immunity has been rejected, they generally involve circumstances in which "officers of reasonable competence," Malley, 475 U.S. at 341, would agree that an immediate threat to the safety of a child did not exist.  See, e.g, Wooley v. City of Baton Rouge, 211 F.3d 913, 924 (5th Cir. 2000) (concluding that police officers who removed a child from the home were not entitled to qualified immunity because "[t]here is no indication in this record of any threat to [the child's] safety, nor were the officers investigating allegations that he previously had suffered abuse"); Roska, 328 F.3d at 1250 (concluding that because the child's health and safety "were not in immediate danger," "clearly established law put the defendants on notice that their conduct [removal without pre-deprivation procedures] violated the Constitution); Malik, 191 F.3d at 1314-15 & 1315 n.5 (affirming the district court's denial of qualified immunity based on the public officials' acknowledgment that the child was not in imminent danger of abuse).

Our holding is also supported by the policies underlying the qualified immunity doctrine.  See Richardson v. McKnight, 521 U.S. 399, 408 (1997)

(observing that the doctrine protects the public from unwarranted timidity on the part of public officials, helps to ensure that talented candidates are not deterred from entering public service, and reduces the chance that lawsuits will distract from the performance of public duties). Here, as we have noted in discussing the grounds supporting the reasonable suspicion standard, "[s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests." Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994). When confronted with evidence of child abuse, they may be required to make "on-the-spot judgments on the basis of limited and often conflicting information," Hatch, 274 F.3d at 22, with limited resources to assist them. They must balance the parents' interest in the care, custody and control of their children with the state's interest in protecting the children's welfare. Additionally, social workers must consider "the vital importance of curbing overzealous suspicion and intervention on the part of health care professional and government officials, particularly when such overzealousness may have the effect of discouraging parents or caretakers from communicating with doctors or seeking appropriate medical attention for children with real or potentially life-threatening conditions." Thomason, 85 F.3d at 1373. In the circumstances of this case, imposing the added burden of potential liability for damages under § 1983 would interfere unnecessarily with the performance of a difficult and essential job.

Accordingly, we conclude that the defendants Megan Annes, Kerri

35

Ketterer, Tess Blackmer, and Deborah Wood are entitled to qualified immunity from the Gomeses' claim for damages under § 1983.[6]

### III. CONCLUSION

We therefore AFFIRM the district court's grant of summary judgment to the defendants.

---

[6] In light of our holding, we do not consider the defendants' alternative arguments for qualified immunity—that they relied upon a state statute and advice of counsel. See Roska II, 328 F.3d at 1251, 1253 (noting that these "extraordinary circumstances" may support the defense of qualified immunity even if the defendants have violated clearly established law, but that they are "rare[]") (internal quotation marks omitted).